UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

DR. ELLIOTT MCGUCKEN, an individual,

Plaintiff,

v.

ERA FRANCHISE SYSTEMS, LLC, *et al.*,

Defendant.

-----------------------------------------------------------------x

Civil Action No. 1:26-cv-00476

**DECLARATION OF ALEX VIDAL IN SUPPORT OF DEFENDANT ERA FRANCHISE SYSTEMS, LLC'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE**

I, Alex Vidal, declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am the President of ERA Franchise Systems, LLC. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto. I submit this Declaration in support of Defendant ERA Franchise System, LLC's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue.

ERA's Business

2.     ERA Franchise Systems, LLC ("ERA") is incorporated in the State of Delaware and maintains its corporate headquarters at 175 Park Avenue, Madison, New Jersey. All of its corporate activities are directed from this address.

3.     ERA is a franchisor of independently owned and operated residential real estate brokerage firms. ERA does not own, operate or otherwise control any real estate brokerages or their brokerage operations.

ERA's Relationship With FastTrack, Inc.

4.     In 2006, ERA entered into a franchise agreement with FastTrack, Inc. ("FastTrack"), a Wyoming corporation with its principal place of business in Rawlins, Wyoming.

5.     FastTrack was a residential real estate brokerage focusing on the Wyoming market.

6.     FastTrack initially operated under the trade name ERA Shepard & Associates. Annexed hereto as Exhibit A is a true and correct copy of the franchise agreement.

7.     In 2016, FastTrack changed its trade name to ERA Frontier Realty. Annexed hereto as Exhibit B is a true and correct copy of an Addendum to Franchise Agreement reflecting the change.

8.     That same year, FastTrack opened a second office in Cheyenne, Wyoming. Annexed hereto as Exhibit C is a true and correct copy of an Addendum to Franchise Agreement reflecting the new office.

9.     FastTrack promoted its business at the web address www.wyomingfrontierrealty.com (the "Website").

10.    ERA did not own, operate, maintain, or have access to post materials on the Website.

11.    ERA did not own or operate FastTrack at any time.

12.    To ERA's knowledge, FastTrack never operated in New York and never engaged in real estate brokerage operations in New York during the period of the franchise relationship.

13.    In 2025, ERA terminated its franchise agreement with FastTrack and since then ERA has no relationship with FastTrack, contractually or otherwise. Annexed hereto as Exhibit D is a true and correct copy of the termination letter.

14.    On information and belief, FastTrack is now known and operating as Aspire Realty.

<u>ERA's Global Business and Minimal New York Contacts</u>

15.     ERA is a global enterprise. It has entered into franchise agreements with franchisees in over 30 countries. These franchisees operate more than 2,300 offices serviced by more than 40,000 real estate agents globally.

16.     Domestically, ERA has franchise agreements with franchisees operating 446 offices in 43 states serviced by more than 11,800 real estate agents.

17.     ERA negotiates and executes its franchise agreements in New Jersey, and they are governed by New Jersey law and contain New Jersey forum selection clauses.

18.     ERA is registered to do business in New York.

19.     ERA does not maintain an office or telephone number in New York.

20.     ERA does not employ any individuals who work in offices located in New York.

21.     ERA does not offer any real estate brokerage services in New York (or anywhere else).

22.     ERA currently has franchise agreements with six New York entities. In total, these six franchisees operate 56 offices serviced by 1,536 real estate agents.

23.     Like the franchise agreement with FastTrack, ERA negotiated and executed these six agreements in New Jersey, and they are governed by New Jersey law and contain New Jersey forum selection clauses.

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this declaration on April 10, 2026 in Dallas, Texas.


*/s/ Alex Vidal*
Alex Vidal


3

# EXHIBIT A



Office I.D. No. **005192-0001**

**ERA FRANCHISE SYSTEMS, INC.**
**REAL ESTATE FRANCHISE AGREEMENT**

**1.0    PARTIES AND TERM (Certain terms are defined in Section 3):**

**1.1    Franchisor.** The word "Franchisor," "we," or "us" means:
**ERA Franchise Systems, Inc.,** a Delaware corporation, its successors and assigns.

By: _____    Date: _____ 4/19, 200**6**
                                       (the "Acceptance Date")

Michael Piccola
Vice-President
Franchise Administration

**1.2    Franchisee.** The word "Franchisee," or "you" means:

**1.2.1    If Franchisee is an entity:**

**FastTrack, Inc.**

(State of Organization: **Wyoming**)

By: _____ Date: _____Feb 3, 2006_____
Print Name:    **Andrea M. Shepard**
Print Title:    _____

By: _____    Date: _____
Print Name:    _____
Print Title:    _____

**1.2.2    If Franchisee is a sole proprietor:**

Signature: _____    Date: _____
Print Name: _____
State of Residence: _____

**THIS AGREEMENT SHALL NOT BECOME EFFECTIVE UNTIL IT IS EXECUTED BY AN AUTHORIZED CORPORATE OFFICER OF ERA, AND THE INITIAL FRANCHISE FEE HAS BEEN PAID.**



**1.3**     **Owners.** The words "Owner" and "Owners" mean the sole proprietor (in his or her capacity as the sole proprietor) or each Person who has a direct equity ownership interest in Franchisee (if Franchisee is an entity). Franchisee represents and warrants that:

**1.3.1**     The following Persons own all of Franchisee's equity ownership interests as stated below.

| Name: | Social Security # | Ownership Interest: |
|---|---|---|
| Andrea M. Shepard | | 100% |
| | | |
| | | |
| | | |

**1.3.2**     If any Owner is an entity, information about the individuals directly or indirectly beneficially owning such entity and their ownership interests appears in Exhibit A, which is ☐ or is not ☒ attached as of the signing of this Agreement.

**1.4**     **Personal Guaranty.** To induce Franchisor to enter into this Agreement, the Owners have executed and delivered the Personal Guaranty of the payment and performance of Franchisee's obligations under this Agreement attached as Exhibit B (the "Personal Guaranty").

**1.5**     **Term of Agreement.** This Agreement becomes a binding agreement upon execution by us (the "Acceptance Date"). You understand that this Agreement will not become effective unless and until signed by our authorized officer. The performance period shall start on the Effective Date (as defined in Section 1.7) and shall expire at 11:59 p.m. on the day preceding the tenth anniversary of the Effective Date (the "Expiration Date"). The period commencing on the Effective Date and ending on the Expiration Date is the "Term" of this Agreement.

**1.6**     **Initial Franchise Fee:**

**1.6.1**     Concurrently with the execution of this Agreement, you shall pay us at our principal office, or at such other place as we may designate, in cash, unless otherwise permitted in writing by us, an initial franchise fee in the amount of $**0.00 (renewal)**. For all additional offices opened by you, you shall pay to us in cash an initial franchise fee per office equal to $7,500.

**1.6.2**     The initial franchise fee is fully earned on the Acceptance Date and is not refundable.

**1.7**     **Effective Date.** You will commence operation of the Business at the Office using the System on **April 1**, 20**05** (the "Effective Date"). All closings that occur on and after the Effective Date will be subject to fee payments as provided in Sections 7 and 8, below. Failure to commence operation by the above date, or to obtain our consent to an extension, shall be a material breach of this Agreement. If you identify the Office as an ERA office or operate the Office under the Marks before the Effective Date without our express written consent, then in addition to our remedies under Section 16, you will begin paying the fee payments as specified in Sections 7 and 8 from the date you identify or operate the Office using the Marks. We may delay the Effective Date until you pay the Royalty Fees or NAF contributions accruing under this Section.

**2.0**     **FRANCHISEE INFORMATION:**

ERA ExhC 11/04                                    2                                    155122.5



**2.1    Business Name.**   You shall operate under the trade name "ERA **Shepard & Associates**," (hereinafter called your "trade name") and shall use no other name in connection with any operations conducted at or from the location specified in Section 2.4 or on computer communication services such as the Internet without our prior written approval. In every visual display in which the ERA logo is used the portion of your trade name immediately following the words "ERA," or other approved words, shall be as required in the P&P Manual, and the total appearance of your trade name and other identifying words must be approved in advance in writing by us. We reserve the right to review and require corrections and modifications to any display of your trade name or our Marks. Our failure to promptly require corrections of, or modifications to, your improper use of your trade name or our Marks shall not be deemed a waiver of our right to do so.

**2.1.1**    You agree that throughout the Term of this Agreement you will operate exclusively under your trade name with respect to all advertising, promotion and communications, including, but not limited to, telephone answering, office sign(s), yard signs, business cards, bank accounts, stationery, promotional and advertising materials, real estate documents, the Internet, and all other materials used in any medium by you. You shall comply, at all times throughout the Term of this Agreement, with all guidelines instituted by us concerning your authorized use and/or presentation of the Marks (including any derivative) and the System on the Internet or other communication systems.

**2.1.2**    You shall file and keep current, in the county and/or state in which your Office is situated and at such other places as may be required by law, a "Fictitious Name Certificate," or comparable instrument, with respect to your trade name under which you have been approved to operate by us. Prior to opening an office under said trade name, you shall supply evidence satisfactory to us that you have complied with all relevant laws regarding the use of fictitious or assumed names. Once established, you may not change your legal entity or trade name without our prior written permission.

**2.1.3**    You shall use your trade name and such other Marks as you may be authorized to use from time to time, exclusively for the purpose of promoting and operating the Business, and for such other lawful business activities as may have been authorized previously in writing by us; provided, however, that we have no obligation to authorize any such additional business activities.

**2.2    Legal Entity.**   If you are an entity, you represent and warrant that it was duly formed under the laws of the jurisdiction stated in Section 1.2.1 and that it validly exists and is in good standing under such laws and the laws of the jurisdiction where the Office is located. You shall not include the words "ERA" as part of your legal name.

**2.3    Responsible Broker.**   The "Responsible Broker" is your licensed real estate broker as required under the laws of the state in which the Office is located. No change in the Responsible Broker shall be made without you and your proposed new Responsible Broker having complied with the provisions of this Agreement. If the Responsible Broker resigns or is terminated, you shall appoint a replacement Responsible Broker within 10 days of the resignation or termination or such shorter period as may be required by law. If you do not name a replacement Responsible Broker within such period, you shall suspend performance, and we may suspend performance, under this Agreement until you retain a replacement Responsible Broker. The name of the initial Responsible Broker is:

Print Name: **Andrea M. Shepard**

You shall not substitute a new Responsible Broker without our prior written consent, which shall not be unreasonably withheld.



**2.4     Office.**  The Business shall be operated exclusively by you and only from the Office location identified in this Section, and you shall not operate any other business and shall not engage in any other activity at or from the Office, either under your trade name or under any other name, without our prior written consent, which consent if granted may be subject to various conditions for each respective approval, including, but not limited to, requirements designed to apprise the public that the products or services offered are not associated with or endorsed by us, or any of our affiliates or our franchisees.  You shall effect or announce no change in the Office location without our prior written consent in accordance with Section 5.1 of this Agreement.  The word "Office" in this Agreement refers only to the location identified by the following address and telephone number(s):

| | |
|---|---|
| Street Address: | **600 Higley Boulevard, P.O. Box 96** |
| City, State and Zip Code: | **Rawlins, WY  82301** |
| Telephone Number: | **(307) 328-0684** |
| Fax Number: | **(307) 328-0687** |

**2.5     Notice Address.**  All notices required under this Agreement must be in writing, to the address stated below, and will be deemed given:

**2.5.1**     if personally delivered to the respective party at the address specified below (or at such other address as a party may subsequently designate for itself by notice to the other party), or

**2.5.2**     if deposited in the United States mail, by certified mail, return receipt requested, postage prepaid, and addressed to the respective party at the address specified below (or at such other address as a party may subsequently designate for itself by notice to the other party),

**2.5.3**     if delivered by courier or an express delivery service (such as DHL or FedEx) that obtains a receipt of delivery, or

**2.5.4**     if faxed, provided that a confirmation copy of any fax transmission is mailed to the respective party via first class United States mail:

Notices to Franchisee shall be sent to:

| | |
|---|---|
| Street Address: | **600 Higley Boulevard, P.O. Box 96** |
| City, State and Zip Code: | **Rawlins, WY  82301** |
| Fax Number: | **(307) 328-0687** |

Unless otherwise specifically provided in the P&P Manual (as defined in Section 3.1.10), notices to Franchisor shall be sent to:

ERA Franchise Systems, Inc.
Attention:  Senior Vice President, Franchise Administration
1 Campus Drive
Parsippany, NJ  07054
Fax Number:  (973) 496-5641

Any notice will be considered given as of the date personally delivered or faxed or three business days after the date of deposit in the United States mail, as the case may be.  Either party has the right to change their address for notice by giving written notice as provided in this paragraph.



**3.0    INTERPRETATION:**

**3.1    Certain Definitions.**  This Agreement assigns the meanings below to the following words and phrases unless the context indicates otherwise:

**3.1.1**    "Ancillary Services" means services which are not directly related to the Business contemplated by this Agreement, including without limitation, title insurance or searches, mortgage banking, loan brokerage, insurance, escrow or appraisals.

**3.1.2**    "Business" means the operation of a real estate brokerage in accordance with the terms and provisions of this Agreement.

**3.1.3**    "Cendant" means Cendant Corporation, our ultimate parent company, its successors and assigns.

**3.1.4**    "Competitive Business" means any business enterprise that is the same as, or similar to, the Business, as such may evolve over time.

**3.1.5**    "Confidential Information" means information owned or licensed by us and involving the operation of the Business, including without limitation, the P&P Manual, electronic communications identification numbers, procedures related to our proprietary communications and referral systems, and other methods and information.  Confidential Information does not include information lawfully in the public domain, and information disclosed without an obligation regarding confidentiality by a party other than you or an Owner.

**3.1.6**    "Franchise Offering Circular" means our Uniform Franchise Offering Circular used in the offer and sale of franchises in your state in effect at the time.

**3.1.7**    "Gross Revenue" means all monies or things of value, calculated at their fair market value in United States currency, received or receivable (i.e., earned but not yet received) by you (including, without limitation, all revenues and commissions received by or on behalf of your independent sales associates, agents, representatives, contractors, employees, partners, directors, officers, Owners, or corporations or other entities which control, are controlled by, or are under common control with you or your other affiliates (collectively, "Affiliate(s)") regardless of whether or not such individuals or entities are entitled to retain all or part of such revenues or commissions), directly or indirectly, in connection with the Business including, but not limited to, transactions and provision of services for which a real estate or auctioneer's license (including appraisal, title or escrow services) is required, the sale or provision of products or services that we or any of our affiliates develop or make available to you directly or through a third party and/or any transaction, sale and/or service in which the Marks or the System is used in any manner, without deducting any of your multiple listing fees, advertising costs, commissions, overrides, bonuses, salaries, gifts, or any other costs or expenses, except outgoing referral fees paid to other licensed real estate brokers.

**3.1.8**    "Marks" means the trademarks, service marks and trade dress that we authorize you to use, in the P&P Manual, including all additional or substitute trademarks, service marks and trade dress that we may authorize you to use.

**3.1.9**    "Person" means an individual, a partnership, a trust, a corporation, a limited liability company, an association and any other incorporated or unincorporated organization or entity.



**3.1.10** "P&P Manual" means our confidential manual(s) of policies, procedures, Standards, know-how, business methods and other information relevant to the Business and the System. In the event of any conflict, discrepancy or ambiguity between the provisions of this Agreement and the provisions of the P&P Manual, the terms and provisions of this Agreement shall prevail and control.

**3.1.11** "Related Party" means a Person who, directly or indirectly, owns or controls a Person, is owned or controlled by a Person, or is under common control with a Person. Control, in this context, means the possession of executive power to direct or to cause the direction of the management and policies of a Person, whether through voting power, ownership, by contract or otherwise.

**3.1.12** "Royalty Fee" has the meaning in Section 7.1.

**3.1.13** "Standards" means our mandatory specifications, standards, methods and procedures prescribed by us in the P&P Manual or this Agreement.

**3.1.14** "System" means the business format and methods developed or licensed by us for the promotion and assistance of independently owned and operated real estate brokerage offices, including policies, procedures and techniques designed to enable such offices to compete more effectively in the real estate sales market. The System includes common use and promotion of certain Marks, copyrights, trade secrets, centralized advertising programs, recruiting programs, referral programs and sales and management training programs. We may update the System at any time and expect to continue to do so as we deem advisable in our sole judgment and discretion.

**4.0    GRANT OF LICENSE:**

**4.1    License; Policy and Procedure Manual.** As of the Effective Date, we grant you a nonexclusive license (i) to use the Marks for the Business at and from the Office and to hold the Business out to be a participant in the System, and (ii) to use the System for the operation of the Business at and from the Office. You accept the nonexclusive license granted by us, subject to the terms and conditions of this Agreement and the P&P Manual as amended from time to time. We will provide to you during the Term access to the P&P Manual, which may consist of one or more publications or may be provided electronically. The P&P Manual contains our standards and recommended methods, specifications and procedures relating to the use and protection of the System. We may modify the P&P Manual, at our discretion, from time to time to reflect changes in the System. We shall provide you with all such modifications and you agree to maintain your copy of the P&P Manual current, if the manual is published. If a dispute develops relating to the contents of the P&P Manual, the master copy that we maintain at our principal office, or the most current edition maintained on our Intranet site, will be controlling. A copy of any part of the P&P Manual may be made for your internal use; the use of any such copy shall be subject to the applicable provisions of this Agreement.

**4.2    Program Expansion and Modification.** We intend, as conditions permit, to modify existing programs and to introduce new programs. We intend to make new programs available generally to those franchisees operating under franchise agreements that are the same or substantially similar to the form of franchise agreement being marketed to our franchisees at the time we implement the programs nationally. We reserve the right to modify, add to, qualify, or eliminate programs as we deem are in the best interests of the System.

**4.3    Participation in Programs.** We may condition participation in the programs upon your compliance with certain requirements, including payment of all your financial obligations to us when due under the



Agreement or otherwise, maintenance of specified program standards, successful completion of any educational programs required by us and payment of a separate fee to participate in all or some of the programs. Only franchisees meeting all program requirements are authorized to utilize the Marks or other identifications that are unique to the program.

### 4.4    Identification and Use of Marks.

**4.4.1**    You acknowledge that we have the exclusive right to use and sublicense the Marks, and that the System and other products and items delivered to you pursuant to this Agreement are our sole and exclusive property and that your right to use the same solely in connection with the operation of the Business is contingent upon your continued full and timely performance under this Agreement. You shall be responsible for, and supervise all of your Affiliates in order to assure, the proper use of the Marks and the System in compliance with this Agreement. You acquire no rights in any of said property, except for your right to use the same under this Agreement. You agree that at no time during this Agreement or at any time after the expiration or termination of this Agreement shall you contest in the United States or any other country our sole and exclusive rights in said Marks and System and other products and items delivered under this Agreement, nor shall you claim any interest therein that is contrary to this Section or at any time dispute, disparage or impugn the validity of the Marks and/or the System. In addition, you acknowledge and agree that you shall be required to comply throughout the term of this Agreement with all guidelines instituted by us concerning authorized use and/or presentation by you of the Marks and the System on the Internet or other communication systems. You acknowledge that such guidelines will prohibit your use of the Marks or any other derivative word or mark on the Internet or other computer communications service in connection with your identification and the operation of the Business other than in compliance with your trade name and in compliance with the P&P Manual. You agree that neither during the term of this Agreement nor at any time after its expiration or termination shall you adopt or employ, or seek to register, any names, marks, insignias, colors, trade dress, URLs, or symbols in the franchise operations or any other business that are confusingly similar to the Marks licensed under this Agreement that are not in compliance with the provisions of this Agreement and/or the P&P Manual. Furthermore, you agree to cooperate with and assist us in connection with any legal action brought by or against us either regarding the protection and preservation of said Marks and System and other products and items delivered under this Agreement. We may undertake from time to time to determine if you are meeting our standards for usage of the Marks. You will promptly correct whatever deficiencies we find to exist.

**4.4.2**    We reserve the right to approve any and all public uses of the Marks, other than those used on our prepared materials. All use of the Marks will inure to our benefit. You acknowledge that we or an affiliate is the sole owner of the Marks and that you will not challenge the validity of the ownership of the Marks or our right to license them to you. At our sole option, we or an affiliate will obtain and maintain its registrations for the Marks and exercise the rights against infringement or unauthorized use of the Marks. You will use or display the Marks solely in connection with the operation of the Business provided for under this Agreement and with no other business, activity or enterprise. You agree to supervise all persons working with or under you in the franchised operation to assure compliance by such persons with all the terms of this Agreement and the P&P Manual.

### 4.5    Office Appearance.    You may be required at our discretion to make reasonable alterations, modifications or upgrades to the office space in which the Business is to be operated.

### 4.6    Office Sign.    You shall install one or more internally lighted exterior signs displaying your trade name, as set forth in Section 2.1 hereof, at the Office, which sign(s) must conform to the standards and



specifications set forth in the P&P Manual, and which SIGN MUST BE APPROVED IN WRITING IN ADVANCE AS TO ARTWORK, LETTERING, COLOR SCHEME, SIZE, CONSTRUCTION AND OVERALL APPEARANCE BY US. Any exception to Office sign requirements because of local sign ordinances or other reasons must first be approved in writing by us.

**4.7    Regular Business Hours.** During the term of this Agreement, you shall diligently, faithfully and continuously conduct the Business at the Office, which shall be open during regular business hours at least six days per week. You also agree to give prompt, courteous and efficient service to the public, and generally to operate the Business in compliance with the P&P Manual and professional standards so as to preserve, maintain and enhance the value of the Marks and the System and the reputation and goodwill built up by us and by our franchisees. Also, you agree to maintain throughout the term of this Agreement all office facilities, equipment, office sign(s), yard signs and all other materials in first-class condition, and to keep them in strict compliance with the P&P Manual.

**4.8    Disclaimer.** You shall place a conspicuous placard or decal on or near the door to the front entrance of the Office, which complies with the standards and specifications set forth in the P&P Manual, which has been approved in writing by us, and which clearly states: "EACH OFFICE IS INDEPENDENTLY OWNED AND OPERATED." Further, you specifically agree to include conspicuously the slogan "EACH OFFICE IS INDEPENDENTLY OWNED AND OPERATED" on all signage, business cards, stationery, promotional and advertising materials, including the Internet and other communications, real estate documents, and all other materials used by you, unless specifically provided otherwise in the P&P Manual or waived in writing by us.

**4.9    Yard Signs.** You shall purchase or lease an adequate quantity of yard signs displaying your trade name and such other information as may be required by law and is in compliance with the standards and specifications in the P&P Manual. You will provide within 60 days after the Acceptance Date either color photographs of the signs or a copy of the order for the signs.

**4.10    Stationery Goods.** You shall purchase adequate supplies of business cards, stationery, promotional materials and related items, which display your trade name and other information, and all of which comply with the standards and specifications of the P&P Manual.

**4.11    Confidentiality.** You acknowledge that all of the information you now have or obtain in the future regarding the System and the concepts and methods of promotion are part of the System and you will treat as confidential all information disclosed to you in confidence. You will never directly or indirectly engage in or aid in the misappropriation, disclosure, divulgence or distribution of any part of the System or the concepts and methods of promoting our franchises. You will use such manuals, programs and materials solely in connection with the operation of the Business and your Franchise and will not direct or permit their copying or reproduction without our express prior written consent. You also will require all your management personnel employed in the Business and your licensed sales associates to enter into an agreement that we can enforce, under which they agree to treat that information as confidential.

**5.0    OFFICE LOCATIONS:**

**5.1    Relocation of Office.** In the event that you seek to change the Office location, you shall submit, no later than 30 days before the date upon which you desire to change location, a written request to us specifying:

**5.1.1**    the requested new location, including photographs of the requested new location;



**5.1.2**  the reason(s) you seek a new approved location; and

**5.1.3**  any other factors which you believe are relevant to our decision to approve or disapprove the new location.  We shall not unreasonably withhold our approval of your application to relocate the Office to another location that is in the general vicinity of the Office location subject to our then current policy and procedure for office relocation.

**5.1.4**  You and your Related Parties and Owners shall be in compliance with this Agreement, the P&P Manual and all other agreements with us or any of our Related Parties in order for us to consider any new location request.

**5.2**  **No Exclusivity.**  You acknowledge that the franchise granted by this Agreement covers only the Office described in Section 2.4 and does not in any way convey or imply any area, market, territorial rights, or protected area proprietary to you.  Except as otherwise expressly provided in this Agreement, we and our Related Parties retain all of our rights and discretion with respect to the Marks, the System and other real estate offices, including without limitation, the rights to:

**5.2.1**  Operate and grant to others the right to operate real estate offices identified by the Marks, at such locations within or outside of your market area, and on such terms and conditions as we or any of our Related Parties deem appropriate;

**5.2.2**  Sell any products or services under the Marks, or under any other trademarks, service marks or trade dress, through other channels of distribution;

**5.2.3**  This Agreement shall not be construed as granting you any right to purchase any additional franchise from us, or as granting any right or priority as to the location of any additional franchise that may be granted by us.  If we enter into any other agreement with you for any other location, such agreement shall be on such terms as we then shall establish;

**5.2.4**  Operate and grant others the right to operate real estate offices located anywhere (whether owned by us or any Related Party, franchisee or licensee of ours) that are part of a franchise system, affiliation or group of real estate offices that are open and operating (or under contractual commitment for development) at the time when we or any Related Party, directly or indirectly, acquire such offices and/or acquire the rights of the franchisor or licensor of such offices, regardless of whether such offices operate (or are converted to operate) using any or all of the Marks and/or any or all of the System or whether such offices operate under other trademarks, service marks or trade dress, and/or use other marketing and operating systems; and

**5.2.5**  Operate and grant to others the right to operate real estate offices identified by trademarks, service marks or trade dress other than the Marks, at such locations within or outside of your market area, and on such terms and conditions as we or any of our Related Parties deem appropriate.

**5.3**  **Additional Offices.**  If you seek to operate the Business from an additional office (the "Additional Office"), such Additional Office must be identified and authorized in a separate agreement.  To be eligible to apply for an Additional Office, you must be in compliance with this Agreement and all other agreements with us or any of our Related Parties, including all financial obligations.  The acceptance or rejection of an application submitted by you for an Additional Office shall be at our sole discretion.



**5.4    Special Offices.** We, in our sole discretion, may establish and modify from time to time special categories of business locations, for example, locations open only on a seasonal basis or locations authorized to offer limited categories of services. Conditions relating to the opening, operation and closing of such special locations, including without limitation, signage, permitted services, the payment of fees and the like, may be set forth in the P&P Manual or in separate agreements. In each instance, we may require you to sign an addendum or amendment to this Agreement or a new franchise agreement in the form then being offered by us for additional offices, for a period of time that may be less than or equal to the remaining Term of this Agreement.

**6.0.    SERVICES AND OBLIGATIONS TO FRANCHISEE:**

**6.1    Our Initial Obligations.** Within a reasonable time after the Acceptance Date, we will:

**6.1.1    Orientation Training.** If this is your first Agreement, provide tuition, lodging (limited to one double room), continental breakfast, and lunch for two persons (for one person if this Agreement is for your second or subsequent Office) from your organization to attend and successfully complete the new franchisee Implementation seminar in Parsippany, New Jersey or such other place we designate. You or your designee(s) will attend the first Implementation seminar offered after the Acceptance Date at which space is available and pay all transportation and personal expenses to attend. Your failure to attend the first Implementation after the Acceptance Date will require you to pay the registration fee and other expenses and will also be a material breach of this Agreement.

**6.1.2    P&P Manual.** Provide you with access to the P&P Manual.

**6.1.3    Continued Operation.** If this Agreement is for an Office location previously operated by you as an ERA® franchise, provide you with an opportunity to attend, at your option, a scheduled new franchisee Implementation seminar without payment of a registration fee, but you must pay your own expenses to attend such orientation.

**6.2    Continuing Obligations.**

**6.2.1    Promotional Materials.** We will produce and maintain an inventory of advertising and marketing materials, sales promotion items and training aids for purchase or for license to use.

**6.2.2    Staff.** We will maintain a staff to consult with you on advertising, marketing and technical matters by telephone, in writing or in person as we deem appropriate and necessary.

**6.2.3    Real Estate License.** We will maintain on our staff, or appoint as our representative, an individual with a valid real estate brokers license.

**6.2.4    Optional Programs.** We, in our sole discretion, may develop, implement, modify and/or discontinue optional programs to enhance the Business. Furthermore, we shall have the right, in our sole discretion, to condition your participation in any one or more of such programs upon you and your Owners and Related Parties being in compliance with this Agreement and all other agreements with us or any of our Related Parties.

**7.0    FRANCHISE ROYALTIES:**

**7.1    Royalty Fee.**



**7.1.1**   You agree to pay us at our principal office, or at such other place as we may designate, in addition to the initial franchise fee set forth above in Section 1.6.1, a "Royalty Fee" equal to 6% of the Gross Revenue earned, derived and/or received by you and Gross Revenue earned, derived and/or received by your Affiliates described in Section 3.1.7, during the Term of this Agreement.

**7.1.2**   Royalty Fees are due and payable in United States currency upon the settlement or close of escrow of each transaction, including previously pending transactions, that occur or sales contracts that are made, on or after the Effective Date and which generate Gross Revenue. Your regularly charged brokerage commission or fee shall be imputed with respect to transactions involving any of your Affiliate(s) acting as a principal for purposes of computing the Royalty Fee payable to us in connection with such transactions. Upon expiration or termination of this Agreement, Royalty Fees shall remain payable as to all transactions entered into, including pending transactions or sales contracts made, prior to the date of such expiration or termination.

**7.1.3**   However, monies or things of value received or receivable by you from transactions involving the renting or leasing of property for a non-renewable term of one year or less and which do not include an option to purchase the property shall not be included in Gross Revenue.

**7.1.4**   Commencing with the first full calendar month following the Effective Date, there shall be a minimum monthly Royalty Fee of $577 per Office (the "Minimum Monthly Royalty Fee"). In the event the aggregate Royalty Fee paid to us during any calendar month totals less than the Minimum Monthly Royalty Fee, you shall pay to us, not later than the 10th day of the following calendar month, the difference between the Minimum Monthly Royalty Fee and aggregate Royalty Fee already paid. The Minimum Monthly Royalty Fee may be adjusted annually as set forth in Section 12 below.

**7.2   Volume Incentive Plan.**   The phrase "Volume Incentive Plan Award" or "VIP Award" means a cash award given by us to you based upon your achievement of certain levels of Gross Revenue and compliance with the operational criteria set forth in this Agreement and the P&P Manual. Each calendar year or part of a calendar year in which you engage in the Business pursuant to the terms of this Agreement is referred to as a "Calculation Year."

**7.2.1**   We may establish conditions to our obligation to pay a VIP Award, including such conditions as may be set forth in the P&P Manual and the following conditions, without limitation:

**7.2.1.1** You and your Owners and Related Parties shall be current with respect to all financial obligations to us and shall otherwise be in compliance with this Agreement and all other agreements with us and/or any of our Related Parties;

**7.2.1.2** You shall achieve minimum levels of participation and performance in our various sponsored programs during the entire Calculation Year; and

**7.2.1.3** You shall have at least 15 months left prior to the expiration of this Agreement.

**7.2.2**   The phrase "Award Date" means April 15th of the calendar year immediately following the Calculation Year. If, as of April 1 following the Calculation Year you have met the conditions set forth in Section 7.2.1 above, we will pay to you, on or before the Award Date, a VIP Award determined for the Calculation Year in accordance with the following table (it is understood that the following table is the table currently applicable to franchisees eligible for VIP Awards; the table to which you are eligible may be different, due to the operation of Sections 7.2.3 and 7.2.4 below):



## 2004 VOLUME INCENTIVE PLAN TABLE

| Annual Gross Revenues Ranges | | | Maximum Range Amount | Multiplier Rate | Maximum Award Per Range | Cumulative Maximum Award |
|---|---|---|---|---|---|---|
| From | | To | | | | |
| $0 | - | $1,375,920 | $1,375,920 | 0.00% | $0.00 | $0.00 |
| $1,375,921 | - | $1,949,220 | $573,299 | 0.00% | $3,750.00 | $3,750.00 |
| $1,949,221 | - | $2,522,520 | $573,299 | 1.25% | $7,166.25 | $10,916.25 |
| $2,522,521 | - | $4,242,420 | $1,719,899 | 1.50% | $25,798.50 | $36,714.75 |
| $4,242,421 | - | $5,962,320 | $1,719,899 | 1.75% | $30,098.25 | $66,813.00 |
| $5,962,321 | - | $7,682,220 | $1,719,899 | 2.00% | $34,398.00 | $101,211.00 |
| $7,682,221 | - | $9,402,120 | $1,719,899 | 2.25% | $38,697.75 | $139,908.75 |
| $9,402,121 | - | $11,122,020 | $1,719,899 | 2.50% | $42,997.50 | $182,906.25 |
| $11,122,021 | - | $12,841,920 | $1,719,899 | 2.75% | $47,297.25 | $230,203.50 |
| $12,841,921 | - | and above | No Maximum | 3.00% | No Maximum | No Maximum |

Within each amount range over $1,949,220, an Award is calculated by multiplying the Gross Revenue achieved by you within the range by the "Multiplier Rate" for that range.

**7.2.3** All of the conditions to our obligation to pay the VIP and all adjustments to the VIP shall be set forth in the P&P Manual. We annually may increase or decrease the percentages and/or dollar amounts set forth in Section 7.2.2 provided that such adjustments may not exceed 20% of the percentages and/or dollar amounts then in effect.

**7.2.4** We shall have the right to offset any VIP Award earned by you against any and all payments, obligations, amounts, whether or not liquidated, that you or any of your Owners or Related Parties may owe to us or any of our Related Parties or affiliates.

**7.2.5** Notwithstanding the provisions of this Section 7.2, if we shall deliver to you a notice of default pursuant to Section 16 of the Agreement, the Gross Revenue accrued during the period beginning the calendar quarter in which such notice is delivered and in which the default remains uncured at the end of the quarter, and continuing for each calendar quarter in which the default remains uncured at the end of such quarter, shall be excluded, for VIP Award purposes, from the calculation of Gross Revenue for the Calculation Year in which such calendar quarter occurs, regardless of whether such default is cured on a timely basis.

**7.2.6** Notwithstanding anything else in this Agreement to the contrary, we agree that for purposes of this Section 7.2, Annual Gross Revenue shall be deemed to include Gross Revenue for all offices operating under a franchise agreement in the same metropolitan area which have the identical ultimate equity ownership; provided that only one VIP Award shall be payable with respect to all of such offices.

**7.3    Continuing Obligation.** Notwithstanding any of the Agreement's provisions and the fact that the VIP will reduce our Royalty Fee revenue, you shall pay us the full amount of Royalty Fees specified in, and in accordance with, the provisions of this Section 7.

**7.4    Construction and Disputes.** We reserve the right to construe and interpret the VIP Program and, in the event of a dispute with regard to the payment of a VIP or interpretation of the VIP Program, our decision shall be final and binding on the parties.



**8.0    NATIONAL ADVERTISING FUND CONTRIBUTION:**

**8.1    NAF Contribution.** Commencing with the first full calendar month following the Effective Date or on the effective date of any assignment, as the case may be, you agree to pay in cash to us at our principal office, or at such other place as we may designate, in addition to the "Royalty Fee," a National Advertising Fund (hereinafter called the "NAF") contribution equal to 2% of your Gross Revenue, as described in Section 3.1.7; provided, however, that your NAF contribution shall be subject to the provisions contained in this Section 8.

**8.2    Minimum Monthly Contribution.** Your per Office contribution shall be subject to minimum and maximum amount limitations. Your initial minimum and maximum monthly contribution amount limitations currently are $313 and $1,080, respectively. However, if you operate more than one franchised office, your maximum monthly NAF contribution per office shall equal $769 plus any adjustments thereto pursuant to Section 12 below. The minimum and maximum monthly NAF contribution levels may be increased under Section 12 of this Agreement; you understand that the minimum and maximum monthly NAF contribution levels may be increased on multiple occasions.

**8.3    Payments.** Any NAF contributions not received by the 10th day of the month when they are due shall be considered past due.

**8.4    Use and Management of NAF.**

**8.4.1**    The NAF is not held in trust and we do not manage it in a fiduciary capacity. We may deposit NAF contributions with our other monies, but will separately and distinctly identify and account for NAF contributions on our books and records. We, in our sole discretion, will manage and use the NAF contributions for the development, implementation, production, placement, payment and costs of NAF advertising and marketing and other related services and programs. The NAF may also be used for other purposes such as training, customer service support, capital improvement incentives for franchised offices, and software development and distribution. As used in this Agreement, "NAF advertising and marketing" means national and regional advertising, marketing, promotions, public relations and/or other programs, including direct mail, market research, customer surveys and test marketing to promote and further the recognition of the Marks, the System and franchisees generally. "Regional" includes any marketing area as defined by us in which you and other franchisees carry on any Business. We shall be entitled to reimburse ourselves, our affiliates and other related parties from the Fund for expenses incurred or advanced to administer and manage the Fund for the conduct of the Fund's activities and for products or services provided to the Fund, including, but not limited to, the reasonable costs of accounting, collection and legal services, as well as other products or services which historically have been provided by unaffiliated third parties, and the costs for employees administering, managing and providing services to the Fund.

**8.4.2**    You understand that the NAF contributions are used for NAF advertising and marketing as well as other services and programs as set forth in the preceding paragraph, and that we are under no obligation to use or allocate NAF contributions on a proportional basis with the NAF contributions collected from any specific geographic area or to benefit any particular member or group of franchisees. We are not obligated to use all the NAF contributions in the year we receive them. If we spend less NAF contributions in any year than the amount of NAF contributions paid into the fund in that year, such excess of NAF contributions will be accumulated for use in future years. The NAF may borrow from us or other lenders to cover deficits of the NAF.



**8.4.3**    Upon your written request, we will provide you with a financial report of the NAF showing the total NAF contributions collected and disbursed for the previous year, certified to be true and correct by one of our authorized officers or audited by an independent certified public accountant. We are not obligated to cause the NAF to be audited or reviewed by an independent certified public accounting firm.

**8.4.4**    Except as expressly provided in this Section 8, we assume no direct or indirect liability or obligation to you with respect to the maintenance, direction or administration of the Advertising Fund.

## 9.0    TECHNOLOGY:

**9.1    Internet Reporting System.** We have developed an Internet based reporting system, consisting of our proprietary software and non-proprietary operating programs, that enables you to transmit required listing information, transaction information and other data. We will provide the software to you without charge during the term of this Agreement. However, you must obtain appropriate connectivity and browser software for this application as well as any platform upgrades that may be necessary. You are responsible for purchasing compatible hardware from a vendor you select. The technology systems are not available for Apple®, Power PCs® or MacIntosh® hardware and are not compatible with OS2®, Unix®, or Linux operating systems.

**9.2    Required Computer Equipment.** The current minimum standards are listed below. You must also maintain high-speed access or a direct telephone line for this computer equipment. You acknowledge that changes in technology may necessitate upgrading, replacing or adding to such equipment or purchasing or leasing additional equipment during the term of this Agreement.

> Minimum Hardware Requirements: Intel Pentium CPU in an IBM-compatible personal computer; 700 MHz speed; 20 gigabyte hard disk drive with 250 MB free space; 256 MB RAM (Random Access Memory) with 2 MB video card memory; Hayes-compatible 56K BPS modem[1]; 15 inch SVGA monitor (800 x 600 or higher resolution with 256 colors; 1024 x 768 resolution recommended); Inkjet printer or equivalent; 16 MB tape or second disk drive (mirrored) for back-up; Windows 98/Windows 98 Second Edition/Windows Millennium Edition (Windows ME)/ Windows 2000/Windows XP; Internet access using Internet Explorer 5.5 or above (6.0 recommended).

**9.3    Access Fee.** You are required to transmit and access certain information, including Affiliate Transaction Reports, through the Internet based reporting system or through such other means as we may require. We may charge an access fee (the "Access Fee") for certain uses of our technology products, including on-line retrieval of listings from our National Listing Bank. We may also charge you a fee when we key in your listing information.

**9.4    Systems Support.** Applications developed by us are licensed and distributed on an "as is' basis. We will use our best efforts to provide support, limited solely to our issued applications. We reserve the right to change the level and type of support provided at any time without notice.

**9.5    Your Responsibilities.** You are responsible for the selection, purchase, installation and support of all hardware and systems software required to run our technology products. We recommend you make

---

[1] The reporting system performs best when a high speed Internet connection is used. Consult your local Internet service provider to find out more about obtaining the fastest possible Internet connection for maximum system performance.



arrangements with a local personal computer consultant or dealer for installation and ongoing support of your computer hardware and software.

## 10.0   MANAGEMENT AND GOODWILL:

**10.1    Management.**  You acknowledge that it is a material consideration to us in granting this Franchise, and it is your stated intent, that this Franchise is granted to a sole proprietor, a partnership, a limited liability company, or a corporation, as the case may be, on the basis that you and your Affiliates, whose names are designated in Section 1 of this Agreement, shall actively participate in the management and/or supervision of the Business, as follows:

**10.1.1**  If you operate as a sole proprietorship, the proprietor agrees to engage in the management and/or supervision of the Business; or

**10.1.2**  If you operate as a partnership (general or limited), you agree that at all times during the term of this Agreement partners owning at least a majority interest in the capital and/or profits of the partnership shall engage in the management and/or supervision of the Business.  Additionally, you shall designate one of the partners or another party as the "Responsible Broker," approved in writing by us, and who shall be responsible for supervising the affairs of the Business and for assuring compliance by you and all your Affiliates with all terms of this Agreement; or

**10.1.3**  If you operate as a corporation or a limited liability company, you agree that at all times during the term of this Agreement that each officer and director of the corporation and one or more shareholders or members who own in the aggregate at least a majority of the outstanding stock/interest in the corporation or limited liability company, respectively, shall engage in the management and/or supervision of the Franchise operation.   Additionally, you shall designate the "Responsible Broker," who shall be responsible for supervising the affairs of the Franchise operations and for assuring compliance by you and all your Affiliates with all terms of this Agreement; and

**10.1.4**  At Section 1 of this Agreement, you designate the names, positions with respect to you and the percent of ownership in the Franchise of your partners, officers, directors, and shareholders, and members, as the case may be.  Any change in the relationship of such designated persons as to your management or any change in your ownership resulting directly or indirectly in the transfer of 25% or more of the ownership rights in capital assets and/or profits of a partnership franchise, in any class of stock of a corporate franchise, or any membership interest in a limited liability company, shall be first approved in writing by us, provided such change or transfer of ownership is in compliance with the provisions of Section 15 of this Agreement. Furthermore, you agree that you will incorporate in your organizational documents (Partnership Agreement, Articles of Incorporation, or Operating Agreements, as the case may be) provisions that are expressly designed to carry out the provisions of this Section and, upon request, shall provide us with evidence of compliance with this provision.

**10.2    P&P Manual.**  You agree to abide by the terms of the P&P Manual and to supervise your Affiliates to assure their compliance with the P&P Manual.  You acknowledge that we have reserved the right to make reasonable changes in the P&P Manual that we determine are important for the continued success and development of the System and its members.  Accordingly, you agree that from time to time we may reasonably change or modify the Marks and the System as well as the standards and specifications set forth in the P&P Manual, including, but not limited to, the modification or adoption of new or modified trade names, trademarks, service marks, sign and logo requirements, or copyrighted materials.  You also agree, at your own expense, to adopt on a timely basis (but in no case later than 90 days after notice) any such modifications as if they were a part of the System at the time of the execution of this Agreement.  We shall notify you by



email or regular mail as to changes in the P&P Manual or other changes in the operational structure of the Franchise.

**10.3    Ethical Conduct, Consumer Relations and Protection of Goodwill.** You will uphold and take reasonable efforts to ensure that your sales associates and employees uphold high standards of honesty, integrity, fair dealing and ethical conduct in dealing with the general public, the customers of the Business, other members and with us. All persons engaged in the Business will comply with the Code of Ethics of the National Association of REALTORS®. You hereby authorize any federal, local or state body regulating or supervising real estate broker practices to release to us information related to complaints and to any disciplinary actions taken based upon your practices or the practices of your affiliates. You also agree to maintain all permits, certificates and licenses (necessary for your operation) in good standing and in accordance with applicable laws and regulations. The parties recognize that from time to time disputes may arise between you, or your Affiliates or agents, and a client, customer or other individual or entity involved in a real estate related transaction, and that it is in the best interest of all parties, when possible, to quickly resolve such disputes. Accordingly, you agree to promptly respond to all complaints received from your customers or clients or other individuals, in an attempt to resolve said dispute in a reasonable business manner. In the event that we: (i) are contacted by a complaining party or become aware of a complaint regarding a particular transaction in which you were involved; and, (ii) make a reasonable determination pursuant to this Section that you, or your agents or Affiliates, have acted in a materially improper fashion in said transaction; and, (iii) determine that the complaint has not been resolved with the complaining party to our satisfaction within a period of 30 days from our determination that you acted in a materially improper fashion, then we may, at our option, terminate this Agreement at any time upon 10 days written notice to you.

**11.0    OTHER COSTS AND OBLIGATIONS OF FRANCHISEE**

**11.1    Marketing Materials.** We will make materials available for you to purchase to promote your Business and our products, services, and programs. You will pay for such purchases by cash, check, money order or credit cards separately from payment of fees under Sections 7 and 8.

**11.2    Payments and Interest.** You shall pay promptly to us all fees and contributions due hereunder, as well as any additional fees or charges incurred for any products, supplies, or services furnished or to be furnished by us at your request. All payments shall be in United States Dollars. Notwithstanding any designation by you, we shall have sole discretion to apply any payments made by you or on your behalf, (and to apply any amounts owed to you or any of your Related Parties by us or any of our Related Parties) to any of your past due indebtedness for Royalty Fees, NAF contributions, purchases from us or any of our Related Parties, interest or any other indebtedness of yours or any of your Related Parties to us or any of our Related Parties. No restrictive endorsement on any check or in any letter or other communications accompanying any payment shall bind us or any of our Related Parties. Our acceptance of any such payment shall not constitute an accord or satisfaction. Our and any of our Related Parties' acceptance of any payments made by you shall not be construed to be a waiver of any breach or default of any provision of this Agreement. Any payments which are more than 10 days past due shall bear interest at the lower rate of either the highest rate allowed by law or 18% per annum simple interest (1.5% per month). You may not withhold payment of any Royalty Fee, NAF contribution or any other amount due to us or our affiliates on the grounds of the alleged non-performance or breach of any of our or our affiliates' obligations under this Agreement or any related agreement, including agreements for the sale or products or services by us or our affiliates to you.

**11.3    Electronic Bill Payment.** You are required to pay all transactions using our form of bill pay, when made available. If you fail to pay electronically, you will be required to authorize us to electronically withdraw from your account any fees or payments due us under this Agreement, any Promissory or

ERA ExhC 11/04                                    16                                    155122.5



Development Advance Promissory Note, or other legally binding agreement with us that requires a payment to be made to us.

**11.4    Offsets.** We may offset any amounts we owe you in full or partial satisfaction of any amounts you owe under this Agreement, or any other agreements between you and us or any of our Related Parties, whenever you are more than 30 days past due.

**11.5    Costs of Collection.** Where permitted by law, you will pay all costs and expenses, including reasonable attorneys' fees, that we incur in the collection of any fees or amounts due from you under this Agreement or otherwise, or any of our related Parties, to enforce the provisions of this Agreement.

**11.6    Returned Checks.** We will charge you a returned check charge on any checks submitted to pay any fee or other amount owed to us returned unpaid for any reason. You must replace any such check with a certified or cashiers check, money order or electronic transfer of funds within 3 days after notification. We may charge the highest commercial rate permissible under the law.

**11.7    Net Worth.** You acknowledge that a material consideration of us in granting this Franchise is the representation by you that you are financially responsible and have a net worth in tangible assets in excess of $75,000 not including the value of your interest in this Agreement or your principal residence. You agree and warrant that at all times throughout the term of this Agreement, you shall maintain a minimum net worth as represented herein. If your net worth falls below the specified amount, you shall be required to procure a guarantor acceptable to us to the extent of the deficiency, which guarantor shall not only guarantee your performance under this Agreement, but also your duties to your clients and to the public.

**11.8    Listing and Pending Listing Inventory.** You agree to supply to us, no later than 15 days after the Acceptance Date, and at all times to maintain with us, a complete and current inventory of all listings, pending or otherwise, of your Business, in our required format, transmitted in our required manner, for us to transmit to our other franchisees or brokers designated by us when appropriate. You consent to our use of your listing and transaction information.

**11.9    International Business Conference.** You or your representative will attend and encourage your sales associates and employees to attend our International Business Conference each year. Each year you will be required to pay for at least one registration fee for the International Business Conference, whether or not you or your representative attend. We may bill you at any time before the International Business Conference for one registration fee at the non-discounted on-site rate, if we have received no registration from your Office at the time of billing.

## 12.0    FEE INCREASES:

**12.1    Annual Increases.** Effective April 1 each year during the term of this Agreement, we may, at our sole option, increase the Minimum Monthly Royalty Fee under Section 7.1.4 and the minimum and maximum NAF contributions under Section 8.2. No percentage increase in fee will exceed the greater of (i) the percentage increase of the Consumer Price Index for all Urban Consumers, U.S. City Average (1967=100) ("CPI") during the period between November of the applicable base year of such particular fee and the November immediately preceding the April 1 on which such fee increase is to take effect plus 3%, (ii) the yield to maturity on United States Treasury Bonds (as listed in The Wall Street Journal or such other source as ERA deems reliable) maturing approximately 10 years after November 1st in the year preceding the effective date of such change plus 3%, or (iii) the US Average Existing Single Family Home Sales annual increase, not seasonally adjusted, yearly percent change, as quoted in the July National Association of Realtors® Press release or any other nationally recognized source of housing price data, at our discretion, plus



3%.  We may round to the nearest dollar the amount of increase resulting from application of the CPI percentage, the Treasury Bond yield, or the housing price percentage.  The applicable base year for each particular fee is defined for CPI purposes as the calendar year immediately preceding the later of the date we first set the fee or the April 1 on which we last raised the fee pursuant to this option.  As of the Effective Date of this Agreement, the base year for all annual increases is 2003.  An increase in any particular fee (for example, Minimum Monthly NAF contribution) does not change the applicable base year for any other particular fee not increased at that time.

**12.2    Other Fee Increases.**  We will also have the right, at our sole option, to impose, eliminate or modify initial franchise fees, training fees, fees to participate in voluntary programs at any time, including, but not limited to, the Sellers Security Plan, referral fees, late charges, returned check charges and access fees, which revisions will not be subject to the limitations described in Section 12.1.

## 13.0  RECORDKEEPING; AUDIT:

**13.1    Recordkeeping, Financial Statements and Audit.**  You will maintain accurate records in the form prescribed by us during the term of this Agreement and for three years after the expiration or termination of this Agreement.  You will provide us with an annual balance sheet and profit and loss statement within 60 days after the end of each calendar year.  You shall also supply to us a complete financial statement, on an annual basis within 90 days of your fiscal year end and a copy of your federal tax return.  You, your principal shareholder or member (if you are a corporation or a limited liability company), or a general partner (if you are a partnership) or your independent accountant shall sign said financial statement certifying the truth and accuracy of the matters contained therein.  Financial statements must be prepared in accordance with generally accepted accounting principles.  You must transmit information to us in the manner and format required by us and allow us or our designee(s) to audit your operations, including your financial record retention systems, or to obtain information from other sources including the local Multiple Listing Service, regarding your Gross Revenues, to verify the Royalty Fees, NAF contributions and any other fees then due under this Agreement during the applicable audit period, as well as any means necessary to calculate VIP Awards.  You must immediately pay us any of such fees or contributions shown by the audit as having been due during the audit period but not paid.  If the audit discloses a deficiency of at least 5% in amounts due under this Agreement for any three-month period, you must also pay all costs incurred by us with regard to the audit and such deficiency will constitute a material breach of this Agreement.  You must also pay the costs of the audit if we must spend more than the average amount of time or energy to get your records in order to do the audit, as compared to an office with a reasonably similar number of listings and transactions. We may charge you an administration fee, of up to $500 currently, if you cancel or reschedule an audit.

**13.2    Access to Records.**  We, or people we may designate in writing, will have the right during the term of this Agreement and for period of three years following any termination of this Agreement, to visit your Office location or administrative office location (or such other place where your records may be located) during normal business hours and without hindrance or delay, proceed:

**13.2.1**    to inspect, audit, check and make copies of and extracts from your books, records (including state and federal tax returns), journals, orders, receipts, any correspondence and other data relating to your Business or to any transactions;

**13.2.2**    to make such verification concerning any portion of such records or of your Business as we may consider reasonable under the circumstances; and



**13.2.3**  to discuss your records and Business with any officers, directors and employees responsible for maintaining the records, or with your Responsible Broker, or with your sales associates with respect to their transactions.

**13.3    Condition of Assignment or Mutual Termination.**  We may require an audit of your operations at any time, including as a condition of our approval of any assignment or mutual termination of this Agreement.

**13.4    Sales Associate Information.**  You will provide us information about your sales associates and allow and assist us in any survey of your sales associates.

**13.5    Other Matters relating to Information.**  No information supplied to us shall be considered confidential by the parties. We shall have the right to use information derived from that supplied by you for our own business purposes, to disclose such information as may be required by law and governmental authority, and to aggregate such information with other franchisee information and disclose such aggregated information as we deem appropriate. You will provide us and/or cooperate with us in collecting other information as we may reasonably request, including information for research and development of services, products and programs, identification of demographic information, industry reports and preparation of the our Uniform Franchise Offering Circular.

**14.0    MODIFICATION OF THE SYSTEM; IMPROVEMENTS; CONFIDENTIALITY:**

**14.1    Agreement to Accept Modifications.**  We may change, augment or modify the Marks or the System, including the adoption and use of new or modified trade names, trademarks, trade dress, service marks, copyrighted materials, new products or services, new equipment, new business methods or new techniques in our sole discretion from time to time, without the consent of the franchisees. You will accept, use and display any such changes in the System as if they were a part of this Agreement at the Acceptance Date. You will make such expenditures as may be required to conform to such changes, augmentations or modifications.

**14.2    Elimination of Programs.**  Notwithstanding any other provision of this Agreement, we reserve the right to modify, suspend or eliminate any new or existing portion of the System or the Marks.

**14.3    Improvements by You.**  If, during the term of this Agreement, you conceive or develop any improvements or additions to the System, new trade names, trademarks, service marks or other commercial symbols related to the Business or any advertising or promotion ideas related to the Business ("Improvements"), you will fully disclose the Improvements to us without disclosing the Improvements to others. You must obtain our written approval before using any of the Improvements. Any Improvements approved by us shall be deemed licensed to us on a royalty-free, paid-up, perpetual worldwide license, and may be used by us and our franchisees without any obligation to you for royalties or similar fees. You assign to us without charge, any and all of your right, title and interest in and to any and all Improvements, including the right to grant sublicenses to use any Improvements. We at our discretion may make application for and own copyrights, trade names, trademarks and service marks relating to any Improvements. We may also consider the Improvements as our property and trade secret. We will authorize you to utilize any Improvements authorized generally for use by other franchisees.

**15.0    ASSIGNMENT:**

**15.1    Assignment Generally.**  You may not assign the rights, or delegate your duties under this Agreement without our advance written approval. We may withhold or condition our approval in our sole



discretion. *The terms of any Addendum to this Agreement will not be assigned as part of any assignment unless we and the assignee execute a new Addendum containing those terms.* For purposes of this Agreement, a transaction or series of transactions resulting in the sale, transfer or other conveyance of a controlling interest in you as the Franchisee, if you are an entity and not an individual, including without limitation the sale of assets, issuance or sale of new or outstanding equity interests or presently exercisable options to purchase equity interests, merger, consolidation, termination, winding up, dissolution and reorganization will be deemed an assignment. If you are owned by an entity, an assignment will be deemed to occur if one of these events or transactions occurs that involves your Owner. If you request approval of an assignment, you will not be relieved of your contractual obligations to us for the remaining term of the Agreement, unless and until we approve the assignment. After an assignment of the Agreement occurs, you will remain liable for events which occurred before the assignment and for all obligations which would survive termination or expiration of this Agreement. Upon assignment, you will not be released from any vicarious liability or tort claims that arose before the assignment occurs.

**15.2    Right of First Refusal.** If you and/or any of your Owners desire to transfer the Franchise (as the phrase "Transfer the Franchise" is defined below), for valuable consideration, you and/or such Owner shall obtain a bona fide, signed, written offer from the potential purchaser and shall deliver immediately to us a complete and accurate copy of such offer. If the offeror proposes to buy any other tangible or intangible assets that do not relate to or are not used by or in the Business from you or any of your Owners or Related Parties (other than rights under other the Agreement), the proposal for such assets or rights must be set forth in a separate, contemporaneous offer that is disclosed to us, but to which this right of first refusal is not applicable. The price and terms of purchase offered to you or your Owner(s) in connection with a proposal to Transfer the Franchise shall reflect the bona fide offered price and not reflect any value for any other assets.

**15.2.1**    Within 30 days from the date of delivery of a complete and accurate copy of such offer to us, we or our assignee shall have the option exercisable by written notice delivered to you or your Owners to purchase the interest which is the subject of the offer for the price and on the terms and conditions contained in such offer; provided, however, that we may substitute cash for any form of in-kind payment proposed in such offer, our credit shall be deemed equal to the credit of any proposed purchaser, and we shall have not less than 90 days from the option exercise date to consummate the transaction. If the interest, which is the subject of the offer involves less than all of your ownership interest, then at our sole option, our right of first refusal shall apply to your entire ownership interest. In such case, the consideration in the offer shall be divided by the percentage interest subject to the offer and the resulting quotient shall be the price to be paid for the entire ownership interest. Terms and conditions for the purchase of the entire ownership interest shall be as similar to the terms and conditions set forth in the offer as practicable, except for the substitute provisions noted above in this subsection.

**15.2.2**    We shall be entitled to purchase such interest subject to all customary representations and warranties, closing documents, releases and indemnities as we reasonably may require, including representations and warranties as to the ownership and condition of, and title to, shares of ownership interests and/or assets, the validity and status of contracts and leases and the extent of liabilities, contingent or otherwise, of the entity whose interests are being purchased. In the event that your entire ownership interest is proposed to be transferred, we also shall have the option to acquire from you, for nominal consideration, an assignment of all of your rights under any lease or sublease covering the Office premises.

**15.2.3**    If we do not exercise our option to purchase, you or your Owners may complete the sale to such offeror pursuant to and on the exact terms of such offer, subject to the approval of the transfer by us as provided in this Section 15; provided, however, that if the sale to such offeror is not completed



within 90 days after delivery of such offer to us or if there is a material change in the terms of the offer, we shall have an additional option to purchase during the 30-day period following either the expiration of such 90-day period or your notification to us of a material change in the terms of the offer.

**15.2.4**  If the proposal to Transfer the Franchise is for no valuable consideration, such as a gift or testamentary transfer or a reorganization of your legal form of organization without any change in the individuals owning such organization, we may not exercise any right of first refusal under this Section 15; however, such a proposal to Transfer the Franchise may constitute an assignment subject to our approval as set forth in this Section 15.

**15.2.5**  The phrase "Transfer the Franchise" means the voluntary or involuntary, direct or indirect, sale, assignment, transfer, license, sublease, collateral or conditional assignment, inter-vivos transfer, testamentary disposition, pledge, encumbrance, creation of a security interest in, or any other disposition of this Agreement, any interest in or right under this Agreement, or any form of your ownership interest or your assets, revenues or income or the Business, including without limitation:

**15.2.5.1**  Any sale, transfer, redemption or issuance of a legal or beneficial ownership interest in the equity interest in, or of any interest convertible to, or exchangeable for, an equity interest in Franchisee;

**15.2.5.2**  Any merger or consolidation of Franchisee whether or not you are the surviving entity;

**15.2.5.3**  Any transfer, out of the ordinary course of business, of any of the assets used in the Business, whether or not in conjunction with a transfer of your rights under this Agreement;

**15.2.5.4**  Any transfer in, or as a result of, a divorce, insolvency, entity dissolution proceeding or otherwise by operation of law;

**15.2.5.5**  Any transfer upon your death or any of your Owners by will, declaration of or transfer in trust, or under the laws of intestate succession; or

**15.2.5.6**  Any foreclosure upon assets of the Business or the transfer, surrender or loss by you of possession, control or management of the Business.

**15.3**    **Death or Other Incapacity.**  At our option, at any time more than: (i) nine months after your death, incapacity of or the appointment of a conservator or guardian for you or your estate if you are a sole proprietorship; or (ii) nine months after the death or incapacity of any of the general partners, or the appointment of a conservator or guardian for the person or estate of any of the general partners, if you are a partnership; or (iii) nine months after the death or incapacity of the Responsible Broker, or the appointment of a conservator or guardian for the person or estate of the Responsible Broker, if you are a corporation or limited liability company; provided, however, that this Agreement shall not terminate if within said nine months (a) this Agreement or the said individual's interest herein is assigned in accordance with the provisions of Agreement to a licensed real estate broker approved by us, or (b) if you are a partnership, limited liability company, or corporation, a licensed real estate broker approved by us shall become the Responsible Broker. "Incapacity" includes a determination of incompetence pursuant to judicial proceedings or suffering a debilitating physical illness that prevents continuance in the ownership and/or operation of the Business.



**15.4    Approval of Assignment; Prerequisites.** Before granting approval of any proposed assignment, we may investigate the business experience, character, reputation and financial responsibility of the proposed assignee to determine the proposed assignee's ability to perform under this or any subsequent franchise agreement. Our approval of any assignment may be based upon various factors which may also include (i) our investigation of the business experience, character, reputation and financial responsibility of the proposed assignee; (ii) the proposed assignee's undertaking to operate in the same marketing area as the assigning Franchisee; (iii) the execution by the proposed assignee and its owners of a franchise agreement and of the guaranty in the forms then being marketed to our prospective franchisees; (iv) payment to us of an assignment fee of $5,000 (which assignment fee will be in lieu of paying an initial franchise fee); (v) payment of all debts of the assignor and assignee to us, the NAF and the applicable local or regional Broker Council, if any; (vi) execution by the assignor of a release of all claims against us and our affiliates; (vii) an audit by us of your operations; and (viii) proof of purchase of tail coverage on your errors and omissions and general liability insurance policies that names us as an additional insured. Furthermore, we may examine the business experience, character, reputation and financial responsibility of the proposed assignee in light of the Gross Revenue and market share of your Business. The prospective assignee must meet our requirements for new franchisees that are in effect at the time of the proposed assignment. We may at our sole option deny approval of the assignment if the assignee lacks sufficient business experience, character, reputation or financial responsibility to maintain our identity and market share in your marketing area to the extent experienced before the assignment. Your assignment without our advance approval will constitute a material breach of this Agreement and, at our sole option, the assignment or attempted assignment of all or any portion of your rights under this Agreement will be null and void and you will remain liable for all obligations under this Agreement.

**15.5    Orientation Training for Assignee.** The assignee must attend the Orientation Training seminar for new franchisees in accordance with the provisions of Section 6.1.1. The assignment fee covers the costs of such implementation as described in Section 6 and integration of the assignee into the System.

**15.6    Assignment by us.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. You are not the third party beneficiary of any contract with a third party to provide services to you under this Agreement. We will have no obligations to you after you are notified that a transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

## 16.0    EXPIRATION AND TERMINATION:

**16.1    Non-Renewability of Agreement.** The Term of this Agreement is set forth in Section 1.5 and, as is provided, certain of your duties and obligations shall survive the expiration or termination of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS.

**16.2    Termination.** This Agreement may be terminated only under the following terms and conditions:

**16.2.1    Mutual Consent.** By mutual consent of the parties;

**16.2.2    Termination by You. Death or Disability of Majority Owner.** By you, in the event a "Majority Owner" (as defined below) dies, is determined to be incompetent pursuant to judicial proceedings or suffers a debilitating physical illness which prevents said Majority Owner from continuing in the ownership and operation of the Business, upon delivery to us of 90 days prior written notice of your decision to terminate and upon delivery to us of a written agreement by you and each of your remaining Principals confirming that each of them will not act as or affiliate with (as an owner, broker or sales associate) any real estate brokerage franchise system or independent real estate



brokerage organization within a 20 mile radius of the Office for a period of 3 years following the effective date of early termination of this Agreement. For the purposes of this paragraph, Majority Owner is defined as the following natural persons: (i) in a sole proprietorship, the proprietor; (ii) in a corporation, any shareholder who owns greater than 50% of the outstanding equity securities of the corporation; (iii) in a limited liability company ("LLC") or limited liability partnership ("LLP"), anyone who holds a greater than 50% interest in the LLC or LLP; or (iv) in a partnership, anyone who owns greater than 50% of the capital or the profits of the partnership. A "Principal" is defined as the following individuals: (i) in a sole proprietorship, the proprietor; (ii) in a corporation, the president, chief executive officer, chief operating officer, any officer who holds the real estate license for the corporation and any shareholder who owns at least 25% of the shares of the corporation; (iii) in a limited liability company, the manager, managing officer and any member who holds at least 25% interest in the limited liability company; or (iv) in a partnership, any general partner or member who owns at least 25% of the capital or profits of the partnership. Notwithstanding the foregoing language, any Owner with an ownership interest of 10% or less shall not be subject to the restrictions set forth in this Section 16.2.2.2.

**16.2.3  Termination by us for Good Cause.** By us for good cause which will mean any material breach by you of your obligations under this Agreement as determined by us in our sole discretion exercised in good faith. Good cause includes both curable and non-curable defaults, including those listed at Sections 16.2.4 and 16.2.5, below, failure to meet Minimum Operating Standards as set forth in Subsection 16.2.7, below, and failure to meet Minimum Office Design and Appearance Standards as set forth in Section 16.2.6, below.

**16.2.4  Curable Defaults; Notice.** After giving you 30 days' advance written notice of the proposed termination and the opportunity to cure the breach during the entire notice period, or such longer or shorter notice as is required or permitted by the law of the state where the Office is located, if the breach is:

**16.2.4.1** The failure to pay when due any financial obligation to us, to the applicable Broker Council, or to the NAF;

**16.2.4.2** Refusal or failure to join and/or participate in any applicable Broker Council or to comply with or abide by the authorized and lawful actions and decisions of that Broker Council;

**16.2.4.3** An audit by us of your records which discloses a deficiency of at least 5% in amounts due under this Agreement within any three month period, or your refusal to permit us to audit your operations and records;

**16.2.4.4** Upon death, judicial determination of incompetence, or the appointment of a conservator or guardian over your person or estate of a Principal as defined in Section 16.2.2.2, the failure to seek written approval from us for assignment within 180 days after such event; such approval will not be necessary if the Business will be conducted by a survivor or heir engaged in the Business or employed by you in the Business before the event;

**16.2.4.5** Any attempt by you to subfranchise (Subfranchising is defined to include, without limitation, any license or grant to any other person or entity of the right to use the Marks or the System licensed to you under this Agreement for the operation of an office owned or leased, in whole or in part, by such other person or entity, or in which such other person or entity is responsible for losses, if any, incurred in the operation of such office);



**16.2.4.6** The actual or attempted cancellation, renouncement or alteration by any parties who have given personal guarantees of your payment and performance under this Agreement, unless we have given advance written consent or you have procured a replacement guarantor satisfactory to us;

**16.2.4.7** If you do not open your approved Office on the Effective Date; or

**16.2.4.8** Any other material breach of this Agreement not listed below as a noncurable default.

Upon receipt of notice to terminate with right to cure, you must immediately commence diligently to cure that breach. If you cure that breach during such period, our right to terminate this Agreement for such breach will cease, subject to termination for repeating the same default as described below.

**16.2.5** **Noncurable Defaults; No Notice Required.** We reserve the right to terminate this Agreement immediately without prior notice and without your right to cure for any of the following causes:

**16.2.5.1** Suspension or revocation of your real estate license;

**16.2.5.2** Any conduct by you which impairs the image, identity, value or goodwill associated with the Marks or the System;

**16.2.5.3** You are the subject of any bankruptcy, receivership, composition, assignment, marshaling, insolvency or similar proceeding for the benefit of creditors, provided that termination upon bankruptcy may not be enforceable under Title 11, United States Code;

**16.2.5.4** Abandonment of your Office(s), demonstrated by removal of the Marks or by your not operating the Business for five consecutive business days or any shorter period when, under the facts and circumstances, it would not be unreasonable for us to conclude that you do not intend to continue to operate the Business, unless the cause is a force majeure beyond your control, e.g., flood, earthquake or similar acts of God;

**16.2.5.5** Any default for which we have issued you a notice of default during the last 12 months advising you of our intent to terminate for the same cause, even if the default(s) were cured; or

**16.2.5.6** Any material misrepresentation or omission by you, or at your direction to us in the franchise application or otherwise with respect to acquiring the Franchise.

**16.2.6** **Failure to Meet Minimum Office Design and Appearance Standards.** You acknowledge and recognize that all Offices must meet certain minimum standards of professionalism as regards Office size, interior design and decor, exterior attractiveness, general appearance and cleanliness. These standards are set forth in the P&P Manual. In the event that your Office fails to meet these Minimum Office Design and Appearance Standards, we will notify you in writing, describing the deficiencies, and you will be given an opportunity of 90 days to correct them. If such deficiencies are not corrected to our satisfaction within such period, we may, at our option, terminate this Agreement.

**16.2.7** **Failure to Meet Minimum Operating Standards.** In the event your performance falls below the minimum operating standards ("Minimum Operating Standards") set forth in this Section 16.2.7, you will be notified in writing setting forth such deficiency and at our option you may be placed on probation for a period of not less than 6 months nor more than 12 months. If such deficiency is not corrected within said probationary period, we may at our option, terminate this Agreement. The



Minimum Operating Standards require that you shall, during every calendar year, beginning the second full calendar year after the Effective Date, close not less than 50 Residential Sales as defined below. A Residential Sales is defined as the closing of the sale of residential real estate for which you were the selling or listing broker, upon which you were obligated to pay Royalties and NAF contributions pursuant to the terms of this Agreement. If you are the listing and selling broker for a Residential Sale, it shall count as two Residential Sales for the purpose of the Minimum Operating Standards. You acknowledge that these Minimum Operating Standards may be modified or supplemented from time to time as published by us in the P&P Manual.

**16.3    Our Pre-Termination Options.** Before termination, if you fail to pay any amount owed under this Agreement, or fail to comply with any term of this Agreement, then in addition to any right we may have to terminate this Agreement or to bring a claim for damages, we will also have the following options:

**16.3.1** To suspend all services provided to you under this Agreement or otherwise, including training, marketing assistance, VIP and other award(s) eligibility for you and your agents, and the sale of products and supplies;

**16.3.2** To suspend taking or placing referrals or relocation requests, Home Protection Plans and/or Sellers Security Plan applications, for or from you and to direct any inquiries regarding these or other programs or services to other franchisees; and/or

**16.3.3** To eliminate listing you in any advertising, marketing or promotional materials, including any directory listings, approved or published by us.

We may continue taking such actions until you have brought your account current, cured any default, and complied with our requirements, and we have acknowledged such compliance in writing. Our exercising one or more of the options permitted in this Section 16.3 will not suspend or release you from any obligation you would otherwise owe to us, the applicable Broker Council or to the NAF. Your right to cure does not restrict our right to initiate or institute any legal action it deems appropriate before, during or after the cure period.

**16.4    Effect of Expiration or Termination.** In the event of expiration or termination, you must immediately, at your expense, return to us all of our property including originals and all copies of the P&P Manual, all copies of our technology products (including copies held or under the control of your sales associates), and all films, cassettes and instruction manuals which are part of our programs. You must also immediately discontinue all use of the Marks licensed to you by this Agreement in any and all of your materials. You must immediately discontinue all use of signs or cross arm signposts displaying our unique style, logo, colors, color patterns and designs and/or Marks. If you desire to use such signs or cross arm signposts after the expiration or termination, you must immediately change the colors and color patterns by complete repainting of the signs or signposts and you must permanently remove or cover any Marks on the signs and must provide us with color photographs of such changed signs and signposts. Effective immediately upon the date of termination or expiration, you will refrain from any representation whatsoever that you are our franchisee or are or have been otherwise affiliated with us. You must immediately advise all of your then-current real estate listings that you are no longer associated with us and must assign your telephone number to us or our designee(s) and immediately cause the local phone company (white pages) and any business phone publisher (i.e., the Yellow Pages) to remove you from its listings of our franchisees in any directory or listings.

**16.5    Effect of Continued Use of the Marks.** Upon expiration or termination for any reason whatsoever, any continued use of the Marks by you, the Business or any of your sales associates: (i) will constitute willful and knowing mark infringement, dilution of our trademark rights and unfair competition; and (ii) may



constitute trafficking in a counterfeit mark for which both civil remedies and criminal penalties may be imposed.

**16.6    Infringement Damages.** If we bring an action against you or anyone associated with you in the Business, before or after expiration or termination, seeking to halt infringement of the Marks, you acknowledge that any court having jurisdiction of the matter may enter temporary restraining orders, preliminary and permanent injunctions without posting a bond or other security; and may order the immediate seizure and destruction of any infringing materials. If any court rules that a bond is required and cannot be waived, you stipulate that a $1,000 bond will be sufficient. Furthermore, in addition to your continuing obligations under Sections 16.7, 16.8 and 16.9 below, you will pay Royalty Fees and NAF contributions on all Gross Revenues during the period of any infringement; attorneys' fees incurred by us in the enforcement of our rights concerning the Marks; and the costs and disbursements of bringing the enforcement action. You acknowledge that if you breach this Agreement and/or continue to utilize the System or Marks at such times when you are not legally entitled to use them, we shall have no adequate remedy at law. Therefore, you expressly consent and agree that we may, in addition to any other available remedies, obtain an injunction and/or temporary restraining order to terminate or prevent the continuation of any existing default or violation, and to prevent the occurrence of any threatened default or violation, by you of this Agreement.

**16.7    Surviving Obligations.**

**16.7.1**    Except as specifically set forth in this Agreement, upon expiration of the Agreement or its termination by us, you will have no further interest or rights pursuant to this Agreement. All financial obligations, incurred before termination or expiration, will not be affected by such expiration or termination; and must be satisfied as would have been required under this Agreement. In addition, you will remain obligated to pay Royalty Fees, NAF contributions and referral fees, on transactions pending at the time of expiration, termination or assignment. The provisions of this Section 16.7.1 also survive termination or expiration of this Agreement.

**16.7.2**    In the event of an "early termination" of this Agreement (which for purposes of this paragraph shall mean any termination of the Agreement by us "for cause," or any termination of this Agreement by you prior to the Expiration Date for any reason other than pursuant to Section 16.2.1 or 16.2.2.2, you shall immediately become obligated to pay us "lost future profits." For purposes of this Agreement "lost future profits" shall consist of all amounts which you would have been obligated to pay as Royalty Fees, NAF contributions, and any other fees due under this Agreement, from the date of early termination through the Expiration Date, had there been no early termination. The parties acknowledge and agree that it would be impracticable or extremely difficult to calculate the actual amount of lost future profits payable by you, and that the following method of calculation represents a fair and reasonable estimate of foreseeable lost future profits: Lost future profits shall be equal to the combined monthly average of Royalty Fees, NAF contributions, and any other fees under this Agreement (without regard to any fee waivers or fee reductions) payable from the Effective Date of this Agreement through the date of early termination, multiplied by the number of months (or partial months) remaining in the term of this Agreement. The present value of the total of these amounts calculated at a discount rate of 8%, assuming payment is made at the end of each month, shall constitute our lost future profits.

**16.8    Other Damages.** If you take any action after this Agreement is terminated or expires that causes damage to us, and we are successful in obtaining judicial relief against you as a result of such action, you will be liable to us for an additional amount equal to the aggregate of our costs of commencing and prosecuting



the action, including, reasonable attorneys' fees, costs of investigation and proof of facts, court costs and other litigation expenses.

**16.9    Post Termination Audit.** You will cooperate with us and permit us to conduct an audit of your records in accordance with Section 13.2 above after this Agreement expires or is terminated.

## 17.0    INDEMNIFICATION AND INSURANCE:

**17.1    Your Indemnification.** You shall indemnify and hold harmless us, and our subsidiaries, affiliates, and our parent, and the directors, officers and employees of each, and all other franchisees from all expenses, fines, suits, proceedings, claims, losses, damages, liabilities or actions of any kind or nature (including, but not limited to, costs and attorneys' fees) arising out of or in any way connected with your operations. You further agree that if we are made a party to a lawsuit or other legal action in connection with the activities of you or any of your Affiliates, then we may tender the defense and/or prosecution of the case to you who shall be responsible for diligently pursuing the case or action at your expense, or we may hire counsel directly to protect our interests and bill you for all costs and attorneys' fees incurred in connection therewith, in which case you shall promptly reimburse us for all costs and expenses which we incurred. This indemnity shall apply to claims that we were negligent or failed to train, supervise or discipline you, and to claims that you or your agents are our agent or part of a common enterprise with us. Your obligations pursuant to this Section shall survive the expiration or termination of this Agreement.

**17.2    Insurance.**

**17.2.1    Required Policies and Coverage.** You will obtain and maintain for the term of the Agreement a commercial general liability insurance policy (including hired and non-owned auto coverage) having combined single limits per occurrence in the amount of at least $1,000,000. You will also obtain and maintain a professional liability (real estate errors and omissions) policy in the amount of at least $1,000,000 per occurrence and any additional types of policies and in such amounts as may be required by applicable law, including, without limitation, workers compensation coverage. We reserve the right to require you to obtain additional types or increased amounts of insurance coverage during the term of this Agreement or to reduce minimum coverage requirements, but you may carry reduced coverage only if and only after you receive our written approval to do so. Such approval may be revoked at any time. If you fail to maintain any required insurance, we may, but are not obligated to, obtain any and all required insurance on your behalf and to charge you for the cost. You will promptly reimburse us for all our costs upon demand.

**17.2.2    Carriers.** All policies must be in form and content satisfactory to us and must be issued by an insurer(s) rated A or better in Class X by Alfred M. Best and Company Inc., or comparably rated by Moody's and/or Standard and Poor's or similarly reliable rating services acceptable to us. We reserve the right to change the minimum acceptable rating requirement.

**17.2.3    Additional Named Insureds.** We and Cendant Corporation, their subsidiaries, successors and assigns must be named additionally as insureds on the commercial general and umbrella insurance policies. We and Cendant Corporation, their subsidiaries, successors and assigns must be named additionally as insureds on the professional liability (errors and omissions) and umbrella insurance policies.

**17.2.4    Notice of Policy Changes or Cancellation.** All policies must provide that they may not be canceled except upon 30 days' advance written notice to us. You must furnish us certificates of such insurance coverage prior to the Effective Date and they must be continually maintained thereafter.



**17.2.5  Annual Certificates.**  You must furnish us certificates of coverage annually on or before the anniversary of the Effective Date.

**17.2.6  Tail Coverage.**  As one of the conditions to our granting approval of an assignment or request for mutual termination of this Agreement, you must purchase and provide evidence to us that you have purchased tail (extended option) coverage on all such policies for a minimum of 12 months after the effective date of any assignment or mutual termination.

**18.0  AMENDMENT:**

**18.1  Written and Signed.**  Any modification, change or amendment to this Agreement must be in writing and signed by the President or any Vice President authorized by our President and by you.

**18.2  Authority to Amend.**  NO FIELD REPRESENTATIVE, INCLUDING ANY DIVISIONAL OR REGIONAL PRESIDENT, REGIONAL VICE PRESIDENT OR REGIONAL OR DISTRICT BUSINESS MANAGER OF OURS HAS THE RIGHT OR AUTHORITY TO MAKE ORAL OR WRITTEN MODIFICATIONS, CHANGES OR AMENDMENTS TO THE TERMS OF THIS FRANCHISE AGREEMENT.  NO SUCH UNAUTHORIZED MODIFICATION, CHANGE OR AMENDMENT WILL BE BINDING UPON EITHER PARTY.

**19.0.  WAIVER:**

**19.1  Waiver; Severability.**  If any provision(s) of this Agreement is or becomes in violation of any local, state or federal law, then such provision(s) will be considered immediately amended to conform to that law. If the violative provision cannot be amended to conform to that law, each party expressly releases the other from any liability under the violative provision of this Agreement if either party cannot fulfill any obligation under this Agreement due to any provisions of local, state, or federal laws governing the violative provision. No waiver of any breach of any term or condition contained in this Agreement will constitute a waiver of any subsequent breach of the same term or condition.

**19.2  Limitations Period.**  Failure, refusal or neglect by you to exercise any right or remedy arising under this Agreement or otherwise, or with any specification, standard or operating procedure, will waive any default arising under this Agreement or your right to any remedy resulting from such action or inaction, and will prevent exercise or enforcement of any right or remedy, unless you provide written notice of such default to us within 12 months after such right or default occurs.

**19.3  Disputes with Others.**  You and we agree that a decision of an arbitrator, mediator or court of competent jurisdiction in arbitration, mediation or litigation to which one of them is not a party will not in any manner prevent the person that was a party to such action from making similar arguments or taking similar positions in any action between you and us.  You and we each waive the right to assert that principles of collateral estoppel prevent either you or us from raising any claim or defense in an action between you and us as a result of such party having lost a similar claim or defense in another action.

**20.0  NON-COMPETITION COVENANTS:**

**20.1  In Term.**  During the term of this Agreement, neither you nor your Owners, officers or your guarantors, or any of the respective spouses of the Owners, officers, guarantors, or Responsible Broker will, directly or indirectly, through ownership or otherwise, engage in any real estate brokerage business



or related business without our advance written consent, unless that business is being conducted under an ERA franchise agreement.

**20.2     Upon Assignment.**  Any assignee of this Agreement must be protected against the potential for unfair competition by your use of our training, assistance and trade secrets in direct competition with us following an assignment of this Agreement.  Therefore, you, your Owners, officers and your guarantors, and any of the respective spouses of the Owners, officers and guarantors, agree that, following assignment of this Agreement, neither you nor your Owners and officers, nor your guarantors, nor any of the respective spouses of the Owners, officers or guarantors, will, for the remainder of the original term of this Agreement, directly or indirectly, operate, own, license, franchise, be employed by or consult with any residential real estate brokerage or related business within a two-mile radius of your Office at your location at the time this Agreement is assigned.  This provision will not apply if the Agreement expires according to its terms.

**20.3     Competing Services or Products.**  During the term of this Agreement, neither you nor any of your Owners, officers, employees, sales associates or agents, will organize, manage, operate, hold any ownership interest in or receive compensation from any firm, company or other business entity which provides or seeks to provide equipment, supplies, services or other operating materials to our other franchisees, without our advance written consent.

**21.0     INDEPENDENT CONTRACTOR:**

**21.1     Independently Owned and Operated.**  You will, at all times, hold yourself and the Business out to be an independently owned and operated business and otherwise operate your Business in compliance with any applicable laws, rules and regulations.  You must conspicuously disclose in the Office, in your real estate sale documents, listing agreements and on all Business cards, stationery, and in all advertisements and in all other printed or recorded material you and your sales associates and employees use, that you are independently owned and operated and are not our agent of or owned by us.  You expressly understand that you will be an independent contractor and must hold yourself out to the general public as such.  This Agreement does not make you an agent, legal representative, joint venture, partner, employee or servant of ours for any purpose.  You are not authorized to make or promise any contract, agreement, warranty or representation on our behalf or an affiliate, except as expressly provided in this Agreement, or to create any obligation, express or implied on our behalf.  You are not authorized to accept service of process or legal notices directed to us.  You acknowledge that this Agreement does not constitute or create, and the relationship between the parties is not, and is not intended to be, a fiduciary relationship.

**21.2     Responsibility for Operations.**  We will have no obligation to pay your commissions, taxes, wages or other expenses, and will have no right to regulate or participate in the recruitment, selection, engagement, retention, discipline or termination of your sales associates or employees, or to determine or limit the parties from whom you may accept listings or to or for whom you may sell property, the commission rates you charge, the commission splits between you and your sales associates, your working conditions, the manner or details of work performed by you or your sales associates or employees, except as may be necessary to protect the Marks and goodwill.  You agree that you are solely responsible for the conduct of the Business operated under this Agreement according to your own judgment, and in accordance with the provisions of this Agreement and the P&P Manual as they may be amended from time to time.

**22.0     MISCELLANEOUS:**

**22.1     Credit Report.**  You authorize us to investigate your credit and will supply us with references and signed consent forms for this purpose.  You consent to exchange of information about you, the Business and



your business and credit history on a privileged basis between us and your references or persons named in your credit report.

**22.2    Broker Councils.**   You support the concept of cooperative marketing activities with other franchisees in your area in order to derive more fully the benefits of local and regional identity.   Therefore, you will join and participate in local and regional Broker Councils when formed to serve the marketing area in which your Office is located.   You will adopt and abide by our Broker Council By-Laws and the decisions of your Broker Council.  We may amend the Broker Council By-Laws from time to time.

**22.3    Taxes.**  You shall pay promptly when due all taxes, accounts, liabilities and indebtedness of any kind incurred by you in the conduct of the Business.  In the event any fees (including, without limitation, royalty fees and the initial franchise fee) payable by you to us are subject to Value Added Taxes, Gross Receipts Taxes, or similar taxes imposed by taxing authorities within the jurisdiction in which you operate, then you shall, in addition to the fees due us, pay to us an additional sum which is equal to and shall represent the amount of such tax imposed on fees due us.

**22.4    Successors and Assigns.**  Subject to the provisions of Section 15, this Agreement will be binding upon and inure to the benefit of the parties and their respective legal representatives, successors and assigns.

**22.5    Headings.**  The headings in this Agreement are for convenience only, do not constitute a part of this Agreement, and will not be deemed to limit or affect any of the provisions of this Agreement.

**22.6    Time of the Essence.**  Time is of the essence of this Agreement.

**22.7    Applicable Law.**  This Agreement will be governed by the laws of the state of New Jersey, except that the New Jersey Franchise Practices Act shall not apply to agreements with Offices located outside New Jersey.

**22.8    Venue and Jurisdiction.**

**22.8.1**   You submit to the non-exclusive personal jurisdiction of the State and Federal courts of New Jersey with respect to any litigation pertaining to this Agreement or to any aspect of the business relationship between the parties.  Such litigation will have venue in State courts in Morris County, New Jersey, or in the United States District Court for the District of New Jersey.

**22.8.2**  You agree that any judicial proceeding will be considered as to its facts and may not be brought as a class action.  You and each of your Owners waive any right to proceed against us by way of class action.  The court will not be precluded from making its own independent determination of the issues in question, notwithstanding the similarity of issues in any other judicial or proceeding involving any other franchisee.  Each party waives the right to claim that a prior disposition of the same or similar issues preclude such independent determination.

**22.9    WAIVER OF JURY TRIAL.  The parties waive the right to a jury trial in any action related to this Agreement or any aspect of the relationship between you, us, any guarantor and their respective successors and assigns.**

**22.10    Waiver of Punitive Damages.**  We and you (and your Owners and guarantors) fully waive any right to or claim for any punitive or exemplary damages against the other and agree that if any dispute arises between them, each will be limited to recovery of actual damages sustained which, in the our case, includes lost future profits as set forth in Section 16.7.2.



**22.11    Attorney Fees.**  In any claim or counterclaim or other legal proceeding brought by either you or us against the other in connection with this Agreement, the prevailing party shall be awarded reasonable attorneys' fees and costs.  The phrase "prevailing party" means the party that recovered the greater relief in the proceeding.

**22.12    Administrative Fees:** We, in our sole discretion, may charge a reasonable administrative fee as set forth in the P&P Manual for processing each of your requests to amend the information set forth in Sections 1.2 through 1.4 and 2.1, 2.2 through 2.5.

**22.13    Variations Among Agreements.**  We specifically reserve the right and privilege, at our sole discretion and as it may deem in the interests of those concerned in any specific instance, to vary standards for any other franchisee based upon the peculiarities of a particular area, circumstance, business practice or other condition which we deem of importance to the successful operation of such other franchisee's business. You will not complain on account of any variation from standard specifications and practices granted to any other member and will not be entitled to require us to grant you a like or similar variation under this Agreement.  You are not the third party beneficiary of any other franchise agreement.

**22.14    Opportunity to Investigate.**  You acknowledge that you have had full opportunity to investigate independently our operations and to be thoroughly advised of the terms and conditions of this Agreement by counsel of your choice.  This Agreement is exclusively for the benefit of the parties hereto and may not give rise to liability to any third party unless this Agreement specifically provides for such liability.  The exercise by us of any right or discretion provided to us under the provisions of this Agreement shall not constitute the absence of good faith.

**22.15    Integration.**  You acknowledge that our operations have been fully explained to you; that you understand its uses, benefits and limitations; and that no representations as to the particular type or amount of benefit to be gained by you have been made by or on our behalf.  You have not relied on any written or oral representations except those specifically included in or made a part of this Agreement in writing.  This Agreement and any written Addendum signed by our authorized officer and by you represents the entire integrated agreement between us and you and supersedes all prior negotiations, representations or agreements, either written or oral, between the parties and their respective representatives.  DO NOT SIGN THIS AGREEMENT IF YOU BELIEVE WE OR ANY OF OUR REPRESENTATIVES HAS PROMISED YOU SOMETHING THAT IS NOT PART OF THIS AGREEMENT, ANY ATTACHED ADDENDUM OR THE OFFERING CIRCULAR.

**22.16    Consent.**  In all cases where our prior consent or acceptance is required and no other method or timing for obtaining such consent or acceptance is prescribed, you shall request such consent or acceptance in writing, and we shall notify you of our decision within 30 days after receiving your written request and all supporting documentation.  Whenever our consent or acceptance is required hereunder, such consent or acceptance must be in writing.  If we do not respond in writing to your request within such 30-day period, the request shall be deemed denied.  Our consent to or acceptance of any request by you shall be effective only to the extent specifically stated and we shall not be deemed to waive or render unnecessary consent or acceptance of any subsequent similar request.  Except where this Agreement expressly obligates us to reasonably accept or consent to (or not to unreasonably withhold our acceptance of or consent to) any action or request by you, we have the absolute right for any reason to withhold our acceptance of or consent to any action requested by you.

**23.    ADDITIONAL REPRESENTATIONS:**  You make the following additional warranties and representations that are an inducement upon which we are relying to enter into this Agreement:



**23.1**    The information provided to us in the franchise application is accurate and complete.

**23.2**    If you are an entity that issues capital stock or certificates of interest ownership, you shall be required to place the following legend on all certificates: "THE TRANSFER OF THIS STOCK/INTEREST IS SUBJECT TO THE TERMS AND CONDITIONS OF THAT CERTAIN FRANCHISE AGREEMENT DATED **April 1, 2005** BETWEEN **FastTrack, Inc., a Wyoming corporation** AND ERA FRANCHISE SYSTEMS, INC.   REFERENCE IS MADE TO SUCH AGREEMENT AND THE RESTRICTIVE PROVISIONS CONTAINED THEREIN." You shall use your best efforts to place said legend on any previously issued stock or certificates.

**23.3**    The address where your records are to be maintained is:

**600 Higley Boulevard, P.O. Box 96, Rawlins, WY  82301**

**23.4**    You are not obtaining this Franchise for speculative purposes and have no present intention to sell or transfer or attempt to sell or transfer the Franchise in whole or in part.

**23.5**    You understand and acknowledge the importance of the high and uniform standards of quality, appearance and service imposed by us in order to maintain the value of our name and the necessity of operating the Office in compliance with our standards.  You represent that you have the present capability and intention to meet those standards.

**23.6.**    You have procured such certificates, licenses and permits, in addition to appropriate real estate licenses, necessary for you to carry on the Business contemplated by this Agreement.

**23.7**    The execution of this Agreement by you will not violate or constitute a breach of the terms of any other agreement or commitment to which you are a party.

**23.8**    The individual executing this Agreement on your behalf is duly authorized to do so; upon its execution, the Agreement shall constitute your valid and binding obligation, and of all of your shareholders, members or partners, if you are a corporation, limited liability company, or partnership.

**23.9**    You acknowledge that no representations, promises, guarantees or warranties of any kind are made or have been made by us or by any person representing himself or herself as our authorized agent or representative to induce you to execute this Agreement, except as specifically set forth in the Franchise Disclosure Documents delivered to you.  You acknowledge that the success of the Franchise is dependent upon your efforts; or your partners, if you are a partnership; or your officers, directors and your shareholders, if you are a corporation; or your members, if you are a limited liability company.  You and the parties listed in Section 1.3.1 of this Agreement represent that they intend to engage in the management or supervision of the Franchise.  You acknowledge that neither we, nor any other person has guaranteed or warranted that you will succeed in the operation of the Franchise, or has provided any sales or income projections of any kind to you.

**23.10**    You, each of your partners (if you are a partnership), each of your officers, directors and shareholders (if you are a corporation), and each of your members (if you are a limited liability company), who will be involved in the management and/or supervision of the Franchise (and whose names are set forth in Section 1.3.1 hereof), have read fully this Agreement, the table of contents of the P&P Manual and the Franchise Disclosure Documents, and fully understand the terms and the import of same, and represent that each is capable of complying and will comply therewith.



**23.11**   You have a net worth in tangible assets in excess of $75,000.00, not including the value of your interest in this Agreement or your principal residence, as of Effective Date of this Agreement, as represented by your financial statement, which has been prepared in accordance with generally accepted accounting principles. This representation shall not be construed in any manner that would in any way restrict or limit your responsibility or degree of obligation and your partners, or your officers, directors and shareholders, as the case may be, as may otherwise be set forth herein, or otherwise be required by law.

**23.12**   <u>U.S. Government Regulations.</u>  As of the effective date of the Agreement, the Owners shall be and, during the entire term of this Agreement shall remain, in full compliance with all applicable laws and regulations of the United States that prohibits unfair, fraudulent or corrupt business practices in the performance of your obligations under this Agreement and related activities.

**24.   STATE LAW ADDENDA:**

**24.1   Illinois Addendum:**  If you are a resident of Illinois, the following provisions shall apply and shall supersede any provision in this Agreement to the contrary:

**24.1.1**   The Illinois Franchise Disclosure Act of 1987, as amended (the "Act"), applies to this transaction and supersedes any conflicting provisions of this Agreement or New Jersey law.

**24.1.2**   The acknowledgments in Section 22.15 of this Agreement shall not constitute a waiver of liability under the Act.

**24.1.3**   The provisions of Section 22.8 of this Agreement which designate jurisdiction or venue in a forum outside of the State of Illinois, shall not be effective for agreements entered into in Illinois.

**24.1.4**   If any of the provisions of this Agreement are inconsistent with applicable state law, then the state law shall apply to the extent such law is constitutional and valid as applied.

**24.1.5**   All other rights, obligations, and provisions of this Agreement shall remain in full force and effect. Only the Sections specifically added or amended by this Addendum shall be effected. This Addendum is incorporated in and made a part of the Agreement for the State of Illinois.

**24.2   Minnesota Addendum:**  If you are a resident of Minnesota, the following provisions shall apply and shall supersede any provision in this Agreement to the contrary:

**24.2.1**   Minnesota law provides franchisees with certain termination and non-renewal rights. Minnesota Statutes, Section 80C.14, Subdivisions 3, 4 and 5 require, except in certain specified cases, that the franchisee be given 90 days notice of termination (with 60 days to cure) and 180 days notice for non-renewal of the franchise agreement.

**24.2.2**   No release language set forth in this Agreement shall relieve us or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of Minnesota.

**24.2.3**   Liquidated damages and termination penalties are prohibited by law in the State of Minnesota and, therefore, Section 16.7 of the Agreement is amended by deleting the current language in Section 16.7.2 and replacing it with the following:

"In the event of an "early termination" of this Agreement (which for purposes of this paragraph



shall mean any termination of the Agreement by us "for cause", or any termination of this Agreement made by you prior to the Expiration Date for any reason other than pursuant to Section 16.2.2 or 16.2.4.4), you shall be, continue and remain liable to us for any and all damages which we have sustained or may sustain by reason of such default or defaults and the breach of the Agreement on your part until the end of the Term.

At the time of such Termination, you covenant to pay to us within 10 days after demand compensation for all damages losses, costs and expenses (including reasonable attorney's fees) incurred by us and/or amounts which would otherwise be payable for and during the remainder of the unexpired Term of the Agreement but for such Termination.  This does not constitute a waiver of your right to a trial on any of the above matters."

**24.2.4** The following language will be incorporated in any franchise agreement issued in the State of Minnesota:

"Pursuant to Minnesota Statute, Section 80C.21 and Minnesota Rule 2860.4400J, this Agreement shall not in any way abrogate or reduce any of your rights as a franchisee as provided for in the Minnesota Statutes 1987, Chapter 80C, including, but not limited to, the right to submit matters to the jurisdiction of the courts of Minnesota or the right to a jury trial."

**24.2.5** Section 16.6 of the Agreement is amended by adding the following:

"You acknowledge that if you breach this Agreement and/or continues to utilize the Marks or the System at such times when you are not legally entitled to use them, we shall have no adequate remedy at law.  Therefore, you expressly consent and agree that we may, in addition to any other available remedies, seek an injunction and/or temporary restraining order to terminate or prevent the continuation of any existing default or violation, and to prevent the occurrence of any threatened default or violation, by you of this Agreement."

**24.2.6** All other rights, obligations, and provisions of the Agreement shall remain in full force and effect. Only the Sections specifically added to or amended by an Addendum shall be affected.

**24.3     Rhode Island Addendum:** If you are a resident of Rhode Island, the following provisions shall apply and shall supersede any provision in this Agreement to the contrary:

**24.3.1** Jurisdiction and Venue: A provision in a franchise agreement restricting jurisdiction or venue to a forum outside Rhode Island or requiring the application of the laws of another State is void with respect to a claim otherwise enforceable under the Rhode Island Franchise Investment Act.

**24.3.2** Section 19-28.1-14 of the Rhode Island Franchise Investment Act provides that:

"A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."

This supersedes Section 22.8 or any other contrary provision of the Agreement.

**24.4     South Dakota Addendum:** If you are is a resident of South Dakota, the following provisions shall apply and shall supersede any provision in this Agreement to the contrary:



24.4.1    Liquidated damages and the termination penalties are prohibited by law in the State of South Dakota. Therefore, Section 16.7 of the Agreement is amended by deleting the current language in Section 16.7.2 and replacing it with the following:

"In the event of an "early termination" of this Agreement (which for purposes of this Paragraph shall mean any termination of the Agreement by us "for cause", or any termination of this Agreement made by you prior to the Expiration Date for any reason other than pursuant to Section 16.2.2 or 16.2.4.4, you shall be, continue and remain liable to us for any and all damages which we have sustained or may sustain by reason of such default or defaults and the breach of the Agreement on your part until the end of the Term.

At the time of such Termination, you covenant to pay to us within 10 days after demand compensation for all damages, losses, costs and expenses (including reasonable attorney's fees) incurred by us and/or amounts which would otherwise be payable for and during the remainder of the unexpired Term of the Agreement but for such Termination. This does not constitute a waiver of your right to a trial on any of the above matters."

24.4.2    Franchise registration, employment, covenants not to compete and other matters of local concern will be governed by the laws of the State of South Dakota. As to contractual and all other matters, the Agreement will be and remain subject to the construction, enforcement and interpretation of the laws of the State of New Jersey. Any provision in the Agreement which designates jurisdiction or venue, or requires the franchisee to agree to jurisdiction or venue, in a forum outside of South Dakota, is deleted from any Agreement issued in the State of South Dakota.

24.4.3    No release language set forth in the Agreement (including, but not limited to Section 18.D thereof) shall relieve the us or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of South Dakota.

24.4.4    Termination provisions covering breach of the Agreement, failure to meet performance standards, and failure to make fee payments contained in the Agreement shall afford you 30 days written notice with an opportunity to cure the default before termination.

24.4.5    Any provision that provides that the parties' waive their right to claim punitive, exemplary, incidental, indirect, special or consequential damages OR any provision that provides that parties' waive their right to a jury trial may not be enforceable under South Dakota law.

24.4.6    The following provision shall be added to the Agreement:

"Pursuant to SDCL 37-5A-86, any acknowledgment provision, disclaimer or integration clause or a provision having a similar effect in a franchise agreement does not negate or act to remove from judicial review any statement, misrepresentation or action that would violate this chapter or a rule or order under this chapter."

24.4.7    **REGISTRATION OF THIS FRANCHISE DOES NOT CONSTITUTE APPROVAL OR RECOMMENDATION OF THE FRANCHISE BY THE DIRECTOR.**

24.5    **Washington Addendum:** If you are a resident of Washington, the following provisions shall apply and shall supersede any provision in this Agreement to the contrary:



**24.5.1**  The State of Washington has a statute, RCW 19.100.180, which may supersede the Agreement in the franchisee's relationship with the franchisor including the areas of termination and renewal of the franchise.    There may also be court decisions which may supersede the Agreement in the franchisee's relationship with the franchisor including the areas of termination and renewal of the franchise.

**24.5.2**  In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the State of Washington, or in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

**24.5.3**  In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW shall prevail.

**24.5.4**  A release or waiver of rights executed by a franchisee shall not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel.  Provisions such as those that unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act such as a right to jury trial may not be enforceable.

**24.5.4**  Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

**24.6    Wisconsin:**  If you are a resident of Wisconsin, the following provisions shall apply and shall supersede any provision in this Agreement to the contrary the following provisions shall supersede and apply to the Agreement:

**24.6.1**  The Wisconsin Fair Dealership Act, Wisconsin Statutes, Chapter 135 (the "Act"), shall apply to and govern the provisions of the Agreement.

**24.6.2**  The Act's requirement, including that in certain circumstances a franchisee or member receive 90 days' notice of termination, cancellation, non-renewal or substantial change in competitive circumstances, and 60 days to remedy claimed deficiencies, shall supersede the provisions of Section 16 of the Agreement to the extent they may be inconsistent with the Act's requirements.

(Balance of Page Intentionally Left Blank.)



## GUARANTY OF PAYMENT AND PERFORMANCE

This Guaranty of Payment and Performance is given by the undersigned, **Andrea M. Shepard (individually a "Guarantor" and collectively "Guarantors")**, effective as of the Effective Date of the Franchise Agreement to ERA Franchise Systems, Inc. ("Franchisor"), in order to induce Franchisor to accept **FastTrack, Inc., a Wyoming corporation** ("Franchisee") as a franchisee of Franchisor.

Each Guarantor, independently of the obligations of Franchisee, does hereby, jointly and severally, guaranty to Franchisor the prompt payment and performance, when due of all obligations of Franchisee under that certain Franchise Agreement bearing even date hereof, including any renewal, replacement or modification of said agreement (the "Agreement"), and any other franchise agreement or other agreement now existing or hereafter entered into between Franchisee and Franchisor.  This Guaranty shall apply to all obligations contained in the Agreement, including the initial franchise fee, all franchise Royalties, Advertising Fees, charges for manuals, supplies, materials, services and products furnished by Franchisor, audit fees, assignment fees, attorneys fees, referral fees, obligations to indemnify and other such charges, fees and assessments provided for under the aforementioned Agreement.

This Guaranty shall be deemed continuing in nature.  This Guaranty shall not be discharged by renewal of any claims guaranteed by this instrument, the suffering of any indulgence to any debt and/or the extension of time of payment thereof.  Presentment, demand, protest, notice of protest and dishonor, and diligence in collecting any obligation under the Agreement are each and all waived by Guarantors and/or acknowledged as inapplicable.  Franchisor shall not be required to pursue any remedy as to said obligations against Franchisee as a condition of the obligation hereunder of Guarantors.

It shall not be a condition to the enforcement of this Guaranty that Guarantors shall be given any notice.

The obligation of each Guarantor hereunder is an absolute and unconditional obligation, and constitutes a guaranty of payment and performance.  Separate action or separate actions may be brought and prosecuted against Guarantors whether action is brought against Franchisee or whether Franchisee is joined in any such action or actions.  Guarantors waive to the fullest extent permitted by law, the benefit of any statute of limitations affecting their liability under this agreement or the enforcement of this Guaranty, any payment by Franchisee or other circumstance that operates to toll any statute of limitations as to Guarantors.  Any Guarantor who is a married person agrees that recourse may be had against his or her separate property for his or her obligations under this agreement.

Each Guarantor hereby expressly waives notice of the acceptance of this Guaranty and agrees that no action or failure to act by Franchisor, including, but not limited to, Franchisor's granting of additional time to pay, shall in any way limit or discharge Guarantor's liability hereunder.

This Guaranty and the liabilities and obligations of Guarantors hereunder are binding upon Guarantors and their respective heirs, executors, successors and assigns, and inure to the benefit of and are enforceable by Franchisor and its successors, transferees, and assigns.

This Guaranty shall be deemed to be made under, and shall be governed by the laws of the State of New Jersey in all respects, including matters of construction, validity, and performance, and its terms and provisions may not be waived, altered, modified, or amended except in writing duly signed by an authorized officer of Franchisor and by Guarantors.

Each Guarantor submits to the non-exclusive personal jurisdiction of the State and Federal courts of New



Jersey with respect to any litigation pertaining to the Franchise Agreement or to any aspect of the business relationship between Franchisor and Franchisee. Such litigation will have venue in the State Courts in Morris County, New Jersey, or in the United States District Court for the District of New Jersey.

If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties to this agreement shall be construed and enforced accordingly.

**Andrea M. Shepard**, Individually and Personally

# EXHIBIT B

ADDENDUM TO FRANCHISE AGREEMENT

THIS ADDENDUM TO FRANCHISE AGREEMENT (the "Addendum") by and between ERA Franchise Systems LLC ("Franchisor") and **FastTrack, Inc., a Wyoming corporation** ("Franchisee"), shall be effective as of the date of execution by Franchisor (the "Effective Date"). **Franchise No.: 005192.**

    1.    The Agreement is amended by adding Section **30** as follows:

    **30.**    **SPECIAL STIPULATIONS**

    **30.1**    **Change in Trade Name (DBA).**  Franchisee has changed its trade name from ERA Shepard  & Associates to **ERA Frontier Realty**.

    2.    Except as stated in this Addendum, no further additions, modifications or deletions to the Agreement are intended by the parties or made by this Addendum.  All capitalized terms not otherwise defined in this Addendum will have the meanings given in the Agreement.  The headings in this Addendum are for convenience only, do not constitute a part of this Addendum, and will not be deemed to limit or affect any of the provisions of this Addendum. The stipulations in this Addendum apply to the Agreement and supersede any inconsistent or conflicting provisions in the Agreement.  These stipulations apply only to Franchisee and are not transferable or assignable.

    3.    This Addendum may be executed in any number of counterparts, each of which will be deemed an original, and all of which, when taken together, will constitute one and the same agreement. Facsimile or electronic copies of this Addendum will be deemed to have the same force and effect as the original and will be fully binding on all parties.

**THE PERSON SIGNING THIS ADDENDUM ON BEHALF OF THE FRANCHISEE REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS ADDENDUM.**

                                                   "FRANCHISEE" **FastTrack, Inc.**

Dated: 9/13/2016 | 3:53 PM PDT     By: *Andrea M Shepard*
                                                 AA8EEF1D77774BD...

                                               **Andrea Shepard**
                                               **Authorized Officer**

                                                 "FRANCHISOR" **ERA Franchise Systems LLC**

Dated: 9/13/2016 | 7:08 PM EDT     By: *David J. Weaving*
                                                 38DFB77382AF4DE...

                                               **David J. Weaving**
                                               **Chief Administrative Officer**

ERA Addendum Sales-Existing.doc

# EXHIBIT C

## LOCATION ADDENDUM TO FRANCHISE AGREEMENT

THIS LOCATION ADDENDUM TO THE FRANCHISE AGREEMENT (the "Addendum") by and between ERA FRANCHISE SYSTEMS LLC ("Franchisor" or "us") and **Fasttrack, Inc. a Wyoming corporation** ("Franchisee" or "you") will be effective as of the date of execution by Franchisor (the "Effective Date"). Franchise # **005192**

## RECITALS

A.      Franchisee presently operates an approved ERA franchise, the main office of which is located at  315 Spruce Street Rawlins, WY 82301 (the "Main Office").  Franchisee and Franchisor have signed a Franchise Agreement governing the operation of the Main Office (as well as any other authorized Offices) with the Effective Date of April 1, 2005 for Franchise # **005192-0001** (the "Agreement").

B.      Franchisee seeks to open a Branch Office at 519 Sunset Drive Cheyenne, WY 82009 to be operated under the terms of the Agreement.

C.      Franchisor has agreed to grant Franchisee the right to operate another authorized Branch Office under the terms of the Agreement, as amended by this Addendum.

## AGREEMENT

In consideration of the provisions in the Agreement, the promises in this Addendum, and other good and valuable consideration, the delivery, receipt, and sufficiency of which are acknowledged, the parties mutually agree as follows:

1.      The Agreement is amended by adding Section **30** as follows:

## SPECIAL STIPULATIONS

**30.1**    **Location.**  Franchisee has been approved to and may operate a Branch Office (the "New Office") at 519 Sunset Drive Cheyenne, WY 82009  (Franchise #**005192-0003**).  The operation of the New Office will be subject to the terms and conditions of the Agreement, as amended by this Addendum. The New Office will commence business under the System on **December 1, 2016,** ("**New Office Opening Date**").

**30.2**    **Initial Franchise Fee.**  Franchisee will pay Franchisor an initial franchise fee of $**7, 500** for the New Office added by this Addendum.

**30.3**    **Brand Marketing Fund.**  For purposes of the New Office, the requirements to pay Brand Marketing Fund ("BMF") (formerly referred to as National Marketing Fund or NMF) contributions will be governed by the Agreement, except that the minimum and maximum BMF contributions for the New Office will be $**408** and $**1,014,** respectively (subject to annual adjustment under the Agreement).  Franchisee acknowledges that Franchisor will use the BMF for the purposes described in Item 11 of the Disclosure Document.

**30.4**    **Conversion Funding.**  If Franchisee satisfies the terms and conditions of this Section, Franchisor will grant Franchisee funding in the amount of $**20,000** (the "Funding"). The Funding will be paid by direct deposit twenty (20) business days after the Opening Date or the date Franchisee satisfies each of the conditions below, whichever occurs later:

DocuSign Envelope ID: C87D371B-5E80-404D-B6C7-114D3F9E979B
DocuSign Envelope ID: D3410561-08C1-4608-98A6-E6A5E5E5EB1E

A. Franchisee has acquired or otherwise merged with Frontier Properties and 365 Real Estate Solutions before January 17, 2017.

B. Franchisee and its Owners, including Andrea M. Shepard and _Troy A. Shepard, sign and return an original Conversion Promissory Note ("CPN") and Guaranty of Payment and Performance. Franchisee must also sign a Security Agreement. The Funding will be recorded in a CPN that provides an annual opportunity for forgiveness of a portion of the principal amount if Franchisee reports and pays fees on $664,653 in annual Gross Revenue (the "Forgiveness Threshold").

C. Franchisee is in full compliance with all agreements and instruments with us, including timely reporting and payment obligations.

D. Franchisee has provided Franchisor a signed direct deposit authorization form and an IRS Form W-9 and any other applicable documentation that Franchisor may reasonably require including documentation to assess Franchisee's creditworthiness.

E. Franchisee affirms that the proceeds of the CPN are intended to be used by Franchisee for business purposes.

F. Franchisee and its Owners affirm that neither has filed a petition for bankruptcy protection under federal or state law

**30.5   Termination by Franchisee.**   Except as provided in this Addendum, any termination right granted to Franchisee under the Agreement for retirement, death or disability is deleted in its entirety and replaced with the following:

**Termination upon Death/Disability of Majority Owner.** If a majority Owner dies or becomes physically or mentally disabled (corroborated by written evidence from a treating physician) and you elect to wind up the Business and distribute all of the Business's assets to the Owners (as opposed to transferring the assets to a third party), you may terminate the Agreement, without penalty, if the following conditions are satisfied:

(a)   You provide us at least ninety (90) days prior written notice of your intent to terminate;

(b)   At the time of the notice, the deceased or disabled majority Owner owns at least 51% of the equity interest in you or the Business's assets and manages your day-to-day operations;

(c)   You are not in default on the date that the notice is delivered or on the date of termination ("Termination Date");

(d)   You provide any documents we request demonstrating your dissolution;

(e)   Before the Termination Date, you pay any outstanding indebtedness you owe us including, but not limited to, Royalty Fees, advertising fund contributions and all amounts not previously paid and/or forgiven under any existing promissory notes (or any other instrument of indebtedness);

ERA EXHC3 10/16                                              2

DocuSign Envelope ID: C87D371B-5E89-404D-B6C7-114D3F9E979B
DocuSign Envelope ID: D3410561-06C1-4608-98A6-E6A5E5E5EB1E

(f)    You and each remaining Owner agree that they will not own or operate any real estate brokerage within two miles of any authorized Office for a period ending the earlier of (i) the Expiration Date, or (ii) two years after the Termination Date; and

(g)    You enter into a written termination agreement. We will not be entitled to recover any liquidated damages under the Agreement if you comply with this Section and perform the post-termination obligations within ten (10) days after the Termination Date.

30.6    **Opportunity to Investigate.** You acknowledge that you have had full opportunity to be thoroughly advised of the terms and conditions of this Addendum by counsel of your choice. Unless expressly provided otherwise, this Addendum is exclusively for our and your benefit and may not give rise to liability to any third party unless specifically stated.

2.    Except as stated in this Addendum, no further additions, modifications or deletions to the Agreement are intended by the parties or made by this Addendum. All capitalized terms not otherwise defined in this Addendum will have the meanings given in the Agreement. The headings in this Addendum are for convenience only, do not constitute a part of this Addendum, and will not be deemed to limit or affect any of the provisions of this Addendum. The stipulations in this Addendum apply to the Agreement and supersede any inconsistent or conflicting provisions in the Agreement. These stipulations apply only to Franchisee and are not transferable or assignable.

3.    Franchisee agrees to keep confidential the terms of this Addendum. If the terms in this Addendum become known to any third party resulting from disclosure by or on behalf of Franchisee, except for Franchisee's disclosure to its legal counsel, accountant, or employees with a need to know the information, any provisions of this Addendum that were made for Franchisee's benefit will become immediately null and void and will forever cease to exist. *In addition, if Franchisee is in default under the Agreement and Franchisee fails to timely cure such default after notice from Franchisor, any provisions of this Addendum that were made for Franchisee's benefit will immediately become null and void, without any further notice from Franchisor, and will forever cease to exist.*

4.    This Addendum may be executed in any number of counterparts, each of which will be deemed an original, and all of which will constitute one and the same agreement. Facsimile or electronic copies of this Addendum will be deemed to have the same force and effect as the original and will be fully bindings.

5.    **WAIVER OF CLAIMS.** In consideration of the rights granted in this Addendum, Franchisee and its owners, partners, members and/or shareholders hereby expressly release, remise, acquit and discharge Franchisor and its predecessors, successors, parents, parent's predecessors, subsidiaries, affiliates, assigns, as well as each of their respective officers, directors, employees and agents (collectively "Releasees") from and forever waive and relinquish any and all claims, counterclaims, rights, setoffs, suits, damages (including, but not limited to, compensatory damages, tort damages, contract damages and punitive damages) demands, obligations, warranties, covenants, debts and causes of action of every nature, character and description, known and unknown, vested or contingent (collectively "Claims") that Franchisee or its owners, partners, members and/or shareholders, individually or collectively, have or may have against any and all Releasees including, but not limited to, all Claims relating in any manner to, or otherwise resulting from, or arising out of: (i) the relationship between the parties prior to the execution of this Addendum; (ii) the franchise sales transaction (to the extent permitted by law); (iii) the Agreement and this Addendum; and/or (iv) any other agreements (including other franchise agreements) by and between Franchisee and/or its owners, partners, members and/or shareholders and Franchisor. In providing this release, Franchisee and its owners, partners, members and/or shareholders expressly acknowledge that, to the extent the laws of the State of California govern

ERA EXHC3 10/16                                      3

the relationship of the parties hereto, Franchisee and its owners, partners, members and/or Shareholders are fully familiar with the provisions of Section 1542 of the Civil Code of the State of California and each expressly waives any and all rights under Section 1542 of the Civil Code of the State of California which provides as follows:

*"A General Release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known to him or her must have materially affected his or her settlement with the debtor."*

**THE PERSON SIGNING THIS ADDENDUM ON BEHALF OF THE FRANCHISEE REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS ADDENDUM.**

"FRANCHISEE"    **Fasttrack, Inc**

By: _____    Dated: 11/8/2016 | 7:00 PM PST

AASEEF407717746D...
Andrea M. Shepard
Authorized Officer/Member/Person

"FRANCHISOR"    **ERA FRANCHISE SYSTEMS LLC**

By: _____    Dated: 12/7/2016 | 5:06 PM EST

38DF977382AF4DE...
David J. Weaving
Chief Administrative Officer

# EXHIBIT D



ERA Franchise Systems LLC

March 19, 2025

**VIA SECOND DAY COURIER & FIRST-CLASS MAIL**

Ms. Andrea Shepard
ERA Frontier Realty
1800 Edinburgh Street
Rawlins, WY  82301

> Re:    Final notice of expiration of the ERA Franchise Agreement dated April 1, 2025, between ERA Franchise Systems LLC and FastTrack, Inc., d/b/a ERA Frontier Realty (the "Franchise Agreement").  Franchise #005192

Dear Ms. Shepard:

You have advised us by email dated February 17, 2025, that you do not intend to extend the term of your Franchise Agreement. Accordingly, this letter shall serve as notice that the Franchise Agreement will expire and will be terminated effective March 31, 2025.  You should take all actions necessary to permanently cease use of the ERA name and any and all trademarks.  In connection therewith, you are required to remove, destroy or return to us any existing signage and materials that bear the ERA name or marks.  You should also remove all ERAtrademarks and references on your website, social media sites, Multiple Listing Services, phone books and other marketing materials, which includes terminating or transferring ownership of all domain names that contain any of Marks to ERA Franchise Systems LLC . Any unauthorized use of the ERAtrademarks is a violation of the Lanham Act, federal and state common law, state unfair competition laws, and other laws barring unfair trade practices.  Such infringement may be redressed by injunctive relief, damages and an award of attorneys' fees.

Our records indicate that your account balance as of March 18, 2025, is **$7,055.33;** broken down as $4,871.08 for Office #005192-0001 and $2,184.25 for Office #005192-0003. In addition to this amount, you are responsible for all fees due and owing under the Franchise Agreement, related agreements or instruments of indebtedness. Please remit payment to Bank of America Lockbox Services, ERA Franchise Systems LLC, 5875 Collections Center Drive, Chicago, IL 60693.  Please note that certain provisions of the Franchise Agreement survive the termination date.  These obligations include, but are not limited to, your continuing duty to pay any current account balances plus any additional fees or contributions that may arise from transactions pending at the time of expiration.  Additionally, you are required to cooperate with us in conducting a post-termination audit of your records.  A representative of our audit department will be in contact with you shortly to coordinate the audit.

Lastly, a representative of ERA Franchise Systems LLC will be performing a site inspection in the near future to ensure that you are in full compliance with your de-identification obligations under the Franchise Agreement.

Your anticipated cooperation with these efforts is appreciated. We thank you for your affiliation with ERA Franchise Systems LLC and wish you continued success in the future.

Thank you,

Heather Patriarca
Franchise Compliance Specialist

175 Park Avenue, Madison NJ 07940



# ACCOUNT SUMMARY

Questions? Call Financial Services **(800) 475-1210**

Make checks payable to: **ERA Franchise Systems, Inc.**

Mail payments to: **5875 Collection Center Drive
Chicago, IL 60693-5875**

As Of Date: 15-APR-25

## OFFICE DETAILS

| | | | |
|---|---|---|---|
| **Co-Office ID** | **005192-0001** | **Office Name** | **ERA Frontier Realty** |
| **Office Location** | 1800 Edinburgh Street<br>Rawlins, WY 82301 | **Billing Address** | 1800 Edinburgh Street<br>Rawlins, WY 82301 |

## BALANCE SUMMARY

| Transaction Type | Current | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | Over 90 Days | Total |
|---|---|---|---|---|---|---|
| Brand Marketing Fund | $0.00 | $454.00 | $454.00 | $0.00 | $0.00 | $908.00 |
| Conversion Note Payable | $2,857.16 | $0.00 | $0.00 | $0.00 | $0.00 | $2,857.16 |
| Royalty Fee | $0.00 | $0.00 | $1,105.92 | $0.00 | $0.00 | $1,105.92 |
| **Total** | **$2,857.16** | **$454.00** | **$1,559.92** | **$0.00** | **$0.00** | **$4,871.08** |

## CURRENT CHARGES

| Transaction # / Fee Id | Description | Transaction Date | Due Date | Transaction Amount | Balance Due |
|---|---|---|---|---|---|
| CNP45949-2024 | Installment for measurement year 2024-Threshold Not Met | 15-APR-25 | 15-APR-25 | $2,857.16 | $2,857.16 |
| | | | **Total Current Charges** | | **$2,857.16** |

## PAST DUE CHARGES

| Transaction # / Fee Id | Description | AGC | Transaction Date | Due Date | Days Late | Transaction Amount | Balance Due |
|---|---|---|---|---|---|---|---|
| 202501BMF00A | 2025-01 Brand Marketing Fund | $0.00 | 03-FEB-25 | 23-FEB-25 | 51 | $454.00 | $454.00 |
| 202502BMF00A | 2025-02 Brand Marketing Fund | $0.00 | 03-MAR-25 | 23-MAR-25 | 23 | $454.00 | $454.00 |
| C00010245785 | 6B5FHF-T03223 - Residential Sale - 609 14th Street Rawlins [L] | $9,600.00 | 05-MAR-25 | 05-MAR-25 | 41 | $576.00 | $576.00 |
| C00010245786 | 6B5FHF-T03223 - Residential Sale - 609 14th Street Rawlins [S] | $8,832.00 | 05-MAR-25 | 05-MAR-25 | 41 | $529.92 | $529.92 |
| | | | | **Total Past Due Charges** | | | **$2,013.92** |



# ACCOUNT SUMMARY

Questions? Call Financial Services (800) 475-1210
Make checks payable to: ERA Franchise Systems, Inc.
Mail payments to: 5875 Collection Center Drive
Chicago, IL 60693-5875

As Of Date: 15-APR-25

## OFFICE DETAILS

| | | | |
|---|---|---|---|
| **Co-Office ID** | **005192-0003** | **Office Name** | **ERA Frontier Realty** |
| **Office Location** | 100 E. 26th St. Cheyenne, WY 82001 | **Billing Address** | 100 E. 26th St. Cheyenne, WY 82001 |

## BALANCE SUMMARY

| Transaction Type | Current | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | Over 90 Days | Total |
|---|---|---|---|---|---|---|
| Brand Marketing Fund | $0.00 | $454.00 | $454.00 | $0.00 | $0.00 | $908.00 |
| Royalty Fee | $0.00 | $0.00 | $1,276.25 | $0.00 | $0.00 | $1,276.25 |
| **Total** | **$0.00** | **$454.00** | **$1,730.25** | **$0.00** | **$0.00** | **$2,184.25** |

## PAST DUE CHARGES

| Transaction # / Fee Id | Description | AGC | Transaction Date | Due Date | Days Late | Transaction Amount | Balance Due |
|---|---|---|---|---|---|---|---|
| 202501BMF00A | 2025-01 Brand Marketing Fund | $0.00 | 03-FEB-25 | 23-FEB-25 | 51 | $454.00 | $454.00 |
| C00010209789 | T00268 - Residential Sale - 3038 S. Avenue B-6 Cheyenne [S] | $4,970.88 | 14-FEB-25 | 14-FEB-25 | 60 | $298.25 | $298.25 |
| 202502BMF00A | 2025-02 Brand Marketing Fund | $0.00 | 03-MAR-25 | 23-MAR-25 | 23 | $454.00 | $454.00 |
| C00010248536 | 94BYSD-T00269 - Residential Sale - 115 Montalto Dr Cheyenne [L] | $16,300.00 | 10-MAR-25 | 10-MAR-25 | 36 | $978.00 | $978.00 |
| | | | | | **Total Past Due Charges** | | **$2,184.25** |

**UPS CampusShip: View/Print Label**

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. GETTING YOUR SHIPMENT TO UPS
   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

   **Customers without a Daily Pickup**
   Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
   Hand the package to any UPS driver in your area.
   Take your package to any location of The UPS Store®, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
   FOLD HERE

